MARY E. O'NEAL v. REFUGE OIL COMPANY.

[41 South. Rep., 67.]

1. MASTER AND SERVANT. *Injury to servant. Defective appliance. Question for jury.*

In a suit by a servant against his master for injuries received because of defective appliances given him with which to work, it is ordinarily and generally for the jury to find whether the servant assumed the risk of such defects.

2. SAME. *Concrete case.*

Facts of the case examined and conclusion reached that the question should have gone to the jury.

FROM the circuit court of Warren county.

HON. OLIVER W. CATCHINGS, Judge.

Mrs. O'Neal, the appellant, was plaintiff in the court below; the oil company, the appellee, was defendant there. The suit was for the alleged wrongful death of plaintiff's husband. From a judgment in defendant's favor, predicated of a peremptory instruction, the plaintiff appealed to the supreme court.

The deceased was in the employ of the appellee as stationary engineer. A part of his duty was to pull cars into the mill by the use of a capstan and a rope, to one end of which a large hook was fastened. This hook was attached to the trucks of the car, and the other end of the rope wound around the capstan, and thus, as the capstan turned, the car was pulled into the mill. While engaged in the performance of this duty, the hook, which weighed between fifteen and twenty pounds, pulled loose from the car to which it was attached, and struck the deceased, who was standing near the capstan around which the rope was being wound, and so injured him that he died as a result of the injury. The declaration charged that the hook and other appliances used to draw the cars into the mill were of a defective and dangerous

character, and that their unsuitable and unsafe condition was known to the appellee, and that deceased had no knowledge of the unsafe, defective, and dangerous character of said appliances, nor had he ever been advised or warned of their unsafe condition.

*Theodore McKnight,* for appellant.

Deceased came to his death by the negligence of the appellee in not providing safe means, ways and appliances for the performance of the work required to be done; the deceased knew nothing of his danger, and appellee did not inform him thereof, although it is shown that by a proper inspection, or by being properly informed as to what are suitable appliances to be used for roping cars, appellee might have known of the unsafe and unsuitable character of the appliances that were being used at the time as applied to the particular purpose for which they were being used.

The evidence in this case does not show an accident pure and simple, as contended by counsel, and the case of *Bell* v. *Refuge Cotton Oil Co.,* 77 Miss., 387 (s.c., 27 South. Rep., 382), has no application.

The facts of this case, as shown by the undisputed proof offered by the appellant, show that the appliances used for roping cars in appellee's mill were both defective and dangerous.

The hook in use at the time of the killing of O'Neal was dangerous and defective.    It was not long enough, not wide enough, and the length at the point was not enough, and the distance across the opening was too narrow, and it was not such a hook as is commonly in use for the purpose to which it was applied.

The dangerous and defective character of the hook for the purpose for which it was used was a question of fact for the determination of the jury and not of the court.

O'Neal had never, before he commenced work for appellee, been engaged in any business or employment having to do with roping cars, as he was required to do for appellee, and did not know of the dangers incident thereto.

*Smith, Hirsh & Landau,* for appellee.

The action of the trial judge in excluding the evidence from the consideration of the jury and directing a peremptory instruction in favor of the defendant, can be sustained on either one of two grounds, to wit: (1) the evidence shows that it was an accident pure and simple; (2) even if the appliance was defective, O'Neal, the deceased, was familiar with this defect and continued to work without complaint.

It will be difficult for the court to get from this record as exact and thorough a knowledge of the situation as the trial judge had, because the record shows that the judge, jury and counsel for the plaintiff and defendant visited the scene of the accident, and testimony was taken on the ground, and the operation of the machinery was fully displayed to the judge.

The deceased was a stationary engineer, knew how to run an engine, and was familiar with machinery, and had capacity enough to see how the machinery and appliances in question worked.

As night engineer, it was his duty to superintend and look after the whole details of the work, the doing of which resulted in the accident causing his death.

This court has settled this case by two decisions: (1) on the proposition that it is not liable for an accident, we cite *Bell* v. *Refuge Cotton Oil Co.,* 77 Miss., 387 (s.c., 27 South. Rep., 382); (2) even if the machinery or appliance was defective, yet the deceased had knowledge of it and continued to use it. *Ballard* v. *Mississippi Cotton Oil Co.,* 81 Miss., 507 (s.c., 34 South. Rep., 533).

WHITFIELD, C. J., delivered the opinion of the court.

The testimony shows beyond all controversy that the proximate cause of the death of O'Neal was the utterly defective and unfit hook used by this corporation in pulling cars in by the use of the capstan; as explained very fully in the record. The witness, Callahan, the chief engineer, shows that he improvised this

hook; that it had been in use about one and one-half years before O'Neal was killed, and that the corporation had continued to use the same hook after his killing; that he (the chief engineer) had never cautioned anybody about handling that hook after O'Neal was killed; that he himself never knew that the hook was dangerous; never had any thought that it was dangerous, and never told Mr. O'Neal that it was dangerous.   The witness Donovan shows, clearly and without any contradiction, that this improvised hook was utterly defective, and was very dangerous, and specifies the particulars wherein it was defective; the chief one being that the point of the hook was not long enough.   He also states that it was not the "standard hook" in use by railroads for this business; that there was a standard hook for this particular purpose in use by railroads; that such standard hook had so been in use a number of years, and that the company should have known it, since the law and rules of the Master Car Builders' Association required the use of a standard hook.   He goes into a detailed comparison of the hook used, which killed O'Neal, and the standard hook, which should have been used, and his testimony condemns the hook used as utterly unfit and extremely dangerous, and further establishes the fact that, if the company did not know of the standard hook, it was guilty of gross negligence in not knowing.   So much for the fact that the hook was an utterly defective one, wholly unfit for the purpose for which it was used, and must have been so known to the defendant corporation, which nevertheless continued to use it after it had killed O'Neal, just as it had been used before, and that, too, without giving any warning of its dangerous character to employes.

O'Neal is shown to have been a sober, industrious, hard-working man, and, as shown by Callahan, when recalled, not "to have served his time as an engineer, but to have had only such experience as he picked up as he went along with his work."   It is perfectly obvious that the only defense that could be made was to show, if it could be shown, and to show clearly, that O'Neal had such knowledge of the defective character of the hook and

the danger from its use as would bar a recovery. On this point, Callahan, the defendant's chief engineer, testifies explicitly that he himself did not know the hook was dangerous, never thought of it as dangerous in his life, and that he had never told O'Neal or any one that it was dangerous. It is true that on his cross-examination, when first introduced, an effort was made to show that, since O'Neal was "a stationary engineer," and was "familiar with machinery," consequently he had "capacity to see how the hook worked," and "in the course of his duty he had occasion to observe how the hook worked," and that he must have observed how the hook worked, etc. All these questions are merely general questions, and received merely general and inconclusive answers. Boiled down, all that was extracted from him on cross-examination amounted to nothing more, in any fair view of it, than that since O'Neal was a stationary engineer, and was familiar with machinery, and in the course of his discharge of his duty would see the cars moved, and sometimes himself moved them, necessarily he must have been familiar with the defect in the hook and the danger from its use. But on redirect examination he was asked this question: "*Q*. What did you mean when you said that Mr. O'Neal had capacity to see how that hook worked?" "*A*. I meant that he was familiar with machinery and all about it. What I mean is, the same difference between you and I, for instance, in regard to that machinery and plant and engine, etc." A purely perfunctory answer. He was again asked: "*Q*. What do you mean by knowing how that thing worked? Do you mean that he knew how to hook on and turn on the capstan?" "*A*. Yes, sir." "*Q*. Do you mean anything else than that?" "*A*. No, sir; just a good, bright man." "*Q*. You did not mean to say, by that expression, that he knew whether it was dangerous or not by looking at it, did you?" "*A*. No, I did not mean that he knew it was dangerous. I never knew it." It is perfectly obvious that the result of this witness' testimony is the statement that he himself did not know it was

dangerous; never told O'Neal that it was dangerous, and that O'Neal did not know it was dangerous so far as the witness knew.

But, again, Callahan says, when recalled, that he never showed O'Neal the hook at all, and did not think of there being any danger from it. He says that he "took him around and showed him where to look out, but never showed him that hook." Indeed, Callahan shows that he worked in the daytime, and O'Neal at night, and he gives that as a reason why he did not see whether O'Neal himself put the hook on the car and moved cars with the hook. But, again—a most vital thing to notice—what precisely was O'Neal's duty? What precisely did he have to do? It is very clearly shown by Callahan that it was O'Neal's duty to stand by the capstan near the throttle valve and operate the capstan. He says: "A man took the line out and hooked it in the car." Again he says that "the labor gang, the men who weigh in and out, etc.," moved the cars. And when he was recalled he was asked: "Did Mr. O'Neal have anything to do with roping cars there—using hooks to rope cars?" And he answered expressly, "No, sir," and repeated the same answer to the question when repeated again. It is obvious enough that O'Neal could not operate the capstan, controlling the steam and the throttle valve, and do the other work of fastening the hook into the truck of the car to be moved, without loss of time. We think it is very clear from the testimony that his business was by the capstan, and that his duty was operating the capstan, and that putting the hook into the cars to be moved was a thing obviously to be done by the labor gang, as stated by Callahan. Surely, on this state of the testimony, it should have been left to the jury to say whether O'Neal had such knowledge of the defective character of this hook, and of the danger from its use, as would bar his recovery.

*Reversed and remanded.*