ILLINOIS CENT. R. Co. *v.* HUMPHRIES.

(Division A. June 11, 1934.)

[155 So. 421. No. 30905.]

Burch, Minor & McKay, of Memphis, Tenn., and **A. M. Pepper,** of Lexington, for appellant.

P. P. Lindholm, of Lexington, and J. G. Holmes, of Yazoo City, for appellee.

Argued orally by **C. N. Burch** and **A. M. Pepper**, for appellant, and by **P. P. Lindholm** and **J. G. Holmes**, for appellee.

**McGowen, J.,** delivered the opinion of the court.

The appellee, as executrix of the estate of her husband, Tom S. Humphries, deceased, brought an action at law against the appellant, the Illinois Central Railroad Company, for damages because of the death of her testate, alleging that while performing his duties as brakeman for said company he was killed, the proximate cause of his death being the negligence of appellant company. The railroad company and Humphries, its employee, were engaged in interstate commerce, and this action is brought under, and is subject to, the Federal Employers'

Liability Act (45 U. S. C. A., secs. 51-59). It is unnecessary to state the pleadings, as issue was joined and the cause submitted to a jury, resulting in a verdict for the appellee in the sum of fifty thousand dollars. From this verdict the railroad company prosecuted an appeal to the supreme court.

Tom Humphries, employed by the Illinois Central Railroad Company as head brakeman, was killed at nine o'clock Monday morning, November 9, 1931, while riding on the footboard attached to the rear of the tender of appellant's locomotive in the station yards at Ethel, as the train was proceeding southwardly on its journey toward Durant, along the line of railroad operated by said company from Durant north to Aberdeen, known as the Aberdeen branch.

Appellee's action was predicated upon appellant's negligence in allowing cinders, with large clinkers embedded therein, to be piled in dangerous proximity to the railroad track, and to so remain for four or five days; with the result that, while standing on the footboard of the moving engine, in the proper and customary performance of his duties, the front part or toes of Humphries' foot came in contact with the cinders, causing him to be thrown from the footboard and swept under the wheels of the cars, his body being so mangled that death speedily ensued.

Appellant denied negligence on its part, denied that there was causal connection between the cinders, if negligently piled, and the death of Humphries; and pleaded that the danger was obvious and understood by him—that he assumed the risk, and his death was due to his own negligence.

On every material point in this case there was sharp conflict. The appellee showed by a number of witnesses that the cinders, mixed with clinkers, were placed alongside the track to a height of from fourteen to nineteen inches, and that the footboard extended to the cinders, or nearly so. The footboard on which Humphries was

riding at the time of the accident extended out from the outer side of the rail about twenty inches, and was about fourteen and a half inches from the level of the ground. A witness at the scene immediately after the occurrence testified that the footboard probably would have touched the cinders; another witness said there was an observable trench in the pile of cinders, near the top thereof. One witness said that these cinders, as described, had been so placed along the railroad track within four or five days of the time when the accident occurred, this being impressed upon her because of the fact that the cinders blocked the route by which she was in the habit of going to and from her place of work, making it necessary to go a different way.

On this line of railroad it was the general practice to use cinders as ballast for the tracks and station yards, delivering them in cars, and dumping them through trapdoors in the bottom of the cars on the track and between the rails. A wooden cross-tie, ten feet in length, would then be attached to the rear of the tender of the engine, behind the wheels thereof, and the engine moved forward, thereby leveling the cinders between the rails, and pushing the surplus to either side of the rails, thus creating a mound or pile on each side. Thereupon it would be the duty of the railroad section foreman and his crew to tamp the cinders between the tracks and "roll" them level outside the tracks.

The photographs in evidence show piles of cinders alongside the track in question, evidently; and further show that shadows were cast on the pile by cars on another track. The photographs offered, as we believe, show the pile of cinders greatly magnified; and we presume it is contended that any photograph here shows actual size, height, or distance.

Ethel is a small town on the Aberdeen branch, north of Durant, with the depot on the east side of the railroad. At this point there are three tracks; beginning on the east side, first, is the house track, next the main line, and last

the passing track. About fifty feet north of the depot is a highway or street crossing, called School street. About one hundred fifty feet north of School street is where the injury occurred, which point is about fifty feet south of where a loading frame is located, where Bell and Blue were engaged in loading logs on a car, and south of this loading frame there were two cars on the east or house track.

On Friday, November 6th, Humphries had gone to Aberdeen on the passenger train in order to serve as brakeman on the local freight south to Durant, which freight train arrived at Ethel about nine A. M. Monday. Humphries was in the car of the engine which stopped at the depot for orders; after receiving orders, it proceeded south, rerailed a derailed car, and performed switching operations both north and south of the depot prior to the accident, although Humphries' exact movements are not traced. He was last seen by Bell and Blue, operators of the log-loading outfit, and by Johnson and Wasson.

As the train proceeded to the depot, ready to resume its trip, Bell and Blue saw Humphries standing on the footboard in the rear of the tender and engine, and as he passed the loading frame he was holding to the handhold on the tender with one hand, while the other was on the back of the car to his rear. About that time the car stopped until a log in the process of loading, and which was suspended in the air across the path of the engine, was swung onto a car on the east track. The witnesses did not see Humphries fall, nor did they know how his death occurred.

Wasson testified that he was walking westward on School street, and, while stopping on the passing track to allow the approaching train to pass, he saw the left side and arm of Humphries as he stood on the footboard of the tender, saw that his feet protruded, saw cinders fly high; and saw his foot shoot out, and his body fall under the train, which rolled over him. The cinders ex-

tended one hundred fifty or one hundred sixty feet north of where Wasson stood, piled as heretofore described. Wasson had signed a contradictory statement, in which he said: "From the best I could tell, his feet did not come out from between the engine and car until after his body fell back and I would not undertake to say what caused him to fall."

It was shown by several witnesses for the railroad company that Wasson had made this statement to the claim agent a few days before the trial; but Wasson denied that the statement correctly represented what he said to the claim agent. It was brought out that this witness had been convicted in the federal court of unlawful possession of whisky, and that he was under a suspended sentence by that court.

Johnson, a witness for the railroad company, saw Humphries standing on the footboard when the train was about fifty feet north of the loading frame, saw him "go down" and disappear from view—adding in his testimony that this occurred north of the frame.

The physical facts demonstrate that Humphries fell, and was killed, about fifty feet south of the loading frame. The disturbed cinders, the blood, and the location of the body render that fact practically certain. The upper part of his body was on the east rail, and to the west thereof; while the lower part was east of the rail, and elevated on the cinder pile. The train, at the time of the accident, was running about five miles an hour, and was promptly stopped.

Two witnesses, both brakemen, testified that in the proper discharge of their duties it was customary, and necessary, for brakemen to ride with their toes protruding, as did Humphries on the occasion of his death, in order to look out beyond the tender and cab of the engine. High, a brakeman, and local chairman of the Brotherhood of Railroad Trainmen, swore that he notified two superior officers and agents of the railroad company concerning the danger to employees from the pile of cinders.

It is unquestioned that High requested the engineer in charge of this train to run slowly at Ethel because of danger from the pile of cinders.

Humphries was shown to have been in perfect health at the time of his death. He was five feet eleven inches in height, weighed two hundred and fifteen pounds, was forty-six years of age, a man strong, active, intelligent, and industrious; and devoted to his wife and children, the former forty-three years of age, and the two boys eleven and thirteen respectively. It was shown that Humphries' life expectancy was twenty-three and eight-tenths years.

Besides serving for years as a brakeman, Humphries was also engaged in the Jersey cattle and dairying business, and in farming. According to Mrs. Humphries, he earned about one hundred dollars a month as brakeman. He kept no books on his farming operations and Jersey cattle sales, but did keep a fairly accurate set which purported to show his net earnings, and which was introduced in evidence; from all of which she concluded that his net earnings for the last three years of his life averaged from three hundred fifty to five hundred fifty dollars a month. Mrs. Humphries exhibited an intelligent understanding of her husband's books and affairs, and she was subjected to a rigid cross-examination as to the minutest item and detail. The dairy books, many in number and complicated, introduced in evidence, were sent up for the inspection of this court.

Mrs. Humphries testified that, in his devotion to his family, all this income was given to them; and for this reason contends that the verdict is not excessive, the evidence being sufficient to show the benefits his dependents might reasonably have expected to receive, even at three hundred fifty dollars a month, had he lived his allotted number of years.

The railroad company contends that, if all costs of operating the farm, taxes, life insurance, and other items should be charged against the income, it would be shown

that Humphries earned only a nominal sum; and therefore only his earnings as brakeman would be left, subject, they say, to reduction in the amount of his own personal living expenses. He was shown to have gone to Aberdeen on November 6th, in order to go on duty, and on the 9th he had not reached home. On other occasions he was absent on duty as brakeman for as long as three days at a time.

It seems that in the year 1929 Humphries owed some seventeen thousand to eighteen thousand dollars; and that in the three-year period from that time until his death he must have paid from his earnings approximately eight thousand dollars on the principal.

The railroad company introduced evidence through a number of witnesses to the effect that the cinders were not piled so high, or in such close proximity to the track, as to come in contact with deceased, even had he been riding on the footboard of the tender, as contended by appellee; that the station yard at Ethel was ballasted with cinders, as were other such yards on the Aberdeen branch; and that they saw nothing there indicative of danger.

1. Appellant insists that it was entitled to a directed verdict, which was refused by the court below, and that at all events appellant's motion for a new trial should have been sustained, because, even if it be conceded that the evidence is conflicting, the overwhelming weight thereof was against the verdict of the jury.

(a) This action arises under the Federal Employers' Liability Act of April 22, 1908, chapter 149, 35 Stat. 65 (45 U. S. C. A., secs. 51-59) and the recovery must be on the basis of negligence only. Delaware, L. & W. R. Co. v. Koske, 279 U. S. 7, 49 S. Ct. 202, 73 L. Ed. 578. And the trial judge is invested with a sound discretion to direct a verdict when the evidence is unreasonable or incredible. See Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597. If the cause of the injury be uncertain, resting solely upon conjecture, a directed

verdict should be for the defendant. Atchison, T. S. & F. Co. v. Saxon, 284 U. S. 459, 52 S. Ct. 229, 76 L. Ed. 397.

(b) Without again reviewing all of the evidence for the appellee in this case, actionable negligence was unquestionably established by the evidence in behalf of appellee. The pile of cinders, containing clinkers, extended from the loading frame to School street, in close proximity to the tracks. The maps and the evidence show that the section foreman whose immediate duty it was to maintain the yard at Ethel in a reasonably safe condition, and the railroad officials, cannot avoid notice of these piles of cinders. The conflict in the evidence as to the circumstances and conditions in the yard was a question for the jury.

(c) The appellant earnestly urges that the fact of the causal connection between the death of Humphries and the pile of cinders is not established in the manner required by the decisions of the supreme court of the United States. On this issue appellant's main contention is that the evidence of Wasson should have been rejected by the trial court; this being eliminated, the causal connection or proximate cause of the injury would rest on imagination or conjecture. Wasson was contradicted by his statement in writing in the presence of witnesses; and it was sought to discredit him further because of the fact that he had been convicted of a misdemeanor. It is also said that his testimony is unreasonable. We think the credibility of Wasson as a witness on the stand, and the effect of the effort to impeach him on all lines, was distinctly a question for the jury, and we are strengthened in the view, for it is evident that the jury believed in the plaintiff's theory of the case, supported by the testimony of the witnesses. Not only that, but on the motion for a new trial the presiding judge of that court, who had heard the testimony and observed the demeanor of the witnesses on the stand, was better qualified to pass on that question, which he has done adversely to the contention of appellant. And we are of opinion that this is consonant

with the view of the supreme court of the United States in the case of Southern Railway Company v. Walters, 284 U. S. 190, 52 S. Ct. 58, 76 L. Ed. 239, wherein the court concluded that the evidence of the witnesses for the plaintiff in that case had no adequate foundation, and that the evidence as a whole was so unsubstantial and insufficient as not to justify the submission of the issue of causal connection to the jury. The testimony of Wasson, to the effect that he saw the cinders fly when the feet of the deceased came in contact with them, the testimony of Rone that there were cinders on the footboard, and of Craig that there was a trench along the top of the cinders, indicating that the footboard of the passing train had made the same, together with the evidence as to the height of the pile of cinders, and the very important fact that clinkers as large as a plate were imbedded in them, in our opinion constitute evidence which is not unreasonable, nor is it based on conjecture. And, if the jury believed the testimony of these witnesses, it showed negligence and a causal connection between the pile of cinders and the death of Humphries. If the cinders were piled as shown by the photographs between the 3d of November and the 9th, then there was evidence sufficient to go to the jury, and its credibility and weight are matters to be submitted to it for decision.

We might add that the testimony of the mayor places the scene of the injury in direct opposition to the physical facts and to the other testimony in the case. It is probable that his view was obstructed by the intervening cars on the passing track, and that Humphries simply faded from his vision. However, his testimony is not in conflict with that of Wasson, or at least it was a question for the jury to determine.

2. It is urged by appellant that the doctrine of assumption of risk is to be applied in this case under the above-cited statute; and that under that doctrine the employee assumes the ordinary risks of the service—those risks which are not created by the negligence of the master—

but does not assume the extraordinary risk of those so created unless he knows and appreciates the dangers thereof.

Under the Employers' Liability Act, the assumption of risk is a defense to an action based thereon. See Jacobs v. So. R. Co., 241 U. S. 229, 36 S. Ct. 588, 60 L. Ed. 970; Louisville & N. R. Co. v. Russell, 164 Miss. 538, 144 So. 478; Yazoo & M. V. R. Co. v. Dees, 121 Miss. 439, 83 So. 613; Chesapeake & Ohio R. Co. v. DeAtley, 241 U. S. 310, 36 S. Ct. 564, 60 L. Ed. 1016.

This issue was submitted to the jury by proper instructions, and was decided adversely to the appellant. If it were true, as assumed by appellant's counsel in his brief, that these cinders had been placed on the yard three months prior to the time of the injury on November 9th, there would then be a strong argument for the application of the doctrine of the assumption of risk on the part of Humphries, in that he not only knew, but must be held to have appreciated, the danger. However, the evidence in this case is very strong and very persuasive that these cinders containing clinkers had been placed at this point after November 3d prior to the accident; and that until the morning on which the accident occurred Humphries had no opportunity to observe them. We say the evidence is strong—a young lady, clerk in a store, testified that she had to abandon her usual route from her home to her place of business on account of the cinders several days preceding the day of the accident. Her testimony was logical and reasonable; and many other witnesses with no personal interest in the case testified to the same effect. On account of the verdict we must discard the theory of appellant that the cinders had remained in that situation for so long a time. It was further suggested that Humphries had passed over this particular point five or six times. So far as this record is concerned, it does show that he rode in the cab of the engine when proceeding south on first coming into Ethel, though as to what he was doing on that occasion the record is silent. Where

he rode on the second occasion is not shown. And, if he was on the train at other times, how he was employed is not disclosed, nor what opportunity he may have had for observation.

In this connection we remark that the photographs and the evidence show that at the hour when Humphries was injured shadows were cast upon the cinders. There is nothing to indicate that he knew of the clinkers imbedded in the cinders; and during the moments immediately preceding his death the train had been stopped because of a log being swung across the track, as hereinbefore stated; and, since it was his duty to be on the lookout, we must assume that his attention was focused upon the cause of delay, and on his business of keeping a lookout. At least, the jury were warranted in so believing.

Even had Humphries seen the cinders while riding in the cab of the train as it approached the station at Ethel on the morning of the accident, still it cannot be assumed that he knew that in the cinders were imbedded clinkers —stony matter vitrified or fused from impurities in burning coal—which might throw him off the train should they come in contact with his feet. We do not think it can be presumed that he appreciated the menace in the pile of cinders, even though he might have been aware of its proximity to the railroad track. This view may be fairly deduced from the testimony in regard to the placing of the cinders as given by witnesses for the plaintiff. Humphries had a right to assume that his employer had performed its duty in exercising reasonable precaution in order to furnish him with a safe place in which to work.

In the case of Jacobs v. So. R. Co., 241 U. S. 229, 36 S. Ct. 588, 60 L. Ed. 970, where a switchman, voluntarily walking on cinders, while carrying a pail of water in one hand, undertook to board a moving engine and fell, the court held that the appellant, Jacobs, appreciated the danger and assumed the risk. We do not think that case applies to the case here before us; the facts being different.

A case strikingly similar to this is Texas & P. R. Co. v. Swearingen, 196 U. S. 51, 25 S. Ct. 164, 49 L. Ed. 382, where the negligence charged was the proximity of a scale box to the switch track. Swearingen knew that the scale box was there, but the court said that he did not know it was so close as to render it unsafe for him to pass it in the performance of his duties as switchman.

We think it was proper to submit the question as to assumption of risk to the jury.

3. It is contended that the court erred in not permitting Dr. Elmore to detail communications made to him in his capacity as physician by Humphries about a year before his death. The ruling of the court below is justified by section 1536, Code 1930. We adhere to the opinion rendered by this court in New Orleans & N. E. R. Co. v. Jackson, 145 Miss. 702, 110 So. 586, to which we have also adhered in the cases of Metropolitan Life Ins. Co. v. McSwain, 149 Miss. 455, 115 So. 555, and Yazoo & M. V. R. Co. v. Decker, 150 Miss. 621, 116 So. 287.

4. We are of opinion that there was no error in the instructions given for the plaintiff, either in respect to liability or the measure of damages, nor was there any error in admitting the clinkers in evidence, said by the witness to be exactly like the ones on the yard where Humphries was killed.

5. We are also of opinion that the verdict of the jury establishes actionable negligence under the act of congress; and that the jury were warranted, under the evidence, in finding that the railroad company had not met the burden upon it to establish its defense of assumption of risk.

6. On the question of damages, there is no adequate basis upon which the verdict in this cause can be upheld.

The pecuniary loss of the beneficiaries, under the statute allowing recovery for the death of a person engaged in interstate commerce, is not measured by what the deceased had earned, or might have earned in the future, but by that portion of his earnings bestowed upon the

beneficiaries, and by the amount thereof which they might reasonably have expected to receive from him had he lived. The books and exhibits, as disclosed by the cross-examination, show that, although Mrs. Humphries testified that the earnings of her deceased husband were from three hundred fifty to five hundred fifty dollars a month, yet it is manifestly clear that from the dairy business, and from his earnings as an employee of the railroad company, there was no such net income. If we accept in full her statement that Humphries devoted all of his net earnings to the support of his beneficiaries, the widow and children, there is no sound basis upon which we can with certainty fix the amount of damages that should be awarded in this case. It is certain that the right to a recovery is shown; and it is equally certain that the deceased supported his family well; but the record is so confused that we are unable to fix the amount. Therefore we are of opinion that we should reverse this cause on the question of damages alone, and send it down to the trial court, there to be tried on the issue of damages.

The cause is therefore affirmed on liability; and reversed and remanded for trial on the question of damages alone.

Affirmed on liability; reversed and remanded on damages.