257 So.2d 187 (1972)
MISSISSIPPI EXPORT RAILROAD COMPANY
v.
John R. TEMPLE.
No. 46482.
Supreme Court of Mississippi.
January 17, 1972.
*188 Williams S. Murphy, Lucedale, for appellant.
H. Bernard Gautier, Pascagoula, for appellee.
RODGERS, Presiding Justice:
This is a personal injury suit. It was filed by the appellee John Temple against the Mississippi Export Railroad for damages sustained because of an accident alleged to have occurred as the result of the negligent operation of a train by the railroad company. The plaintiff John Temple obtained a judgment against the railroad company and it has appealed to this Court.
At the time of the accident the appellee had been for many years an employee of International Paper Company, as a "car bracer". His job was to prepare the trucks and railroad boxcars for loading. He cleaned out the trucks and railroad boxcars. He then nailed small strips of wood on the floor and sides of the boxcars *189 so that the paper manufactured by International Paper Company could be stacked on these strips to prevent damage to the paper product.
The injury to the plaintiff occurred in the loading dock area. This area was used to load the finished paper product into the freight cars and automobile trucks. The area consisted of a five or six hundred-foot-long loading dock under a shed. Two sets of railroad tracks ran along under the shed by the loading dock. At the end of these railroad tracks there were iron obstruction blocks called "stoppers". The purpose of these "stoppers" was to stop the train at the end of the track. Below and beyond the end of the tracks was an area where trucks were backed into the dock for loading. The injury occurred in the area beyond the end of the tracks where the trucks were being prepared for loading.
On the evening of January 28, 1969, at seven o'clock the railroad crew was engaged in placing or "spotting" freight cars along the two tracks under the shed adjacent to the "loading dock" so that the freight cars could be loaded with paper and moved out for shipment.
The "railroad crew" consisted of a conductor, an engineer, a "head brakeman" and a "tail brakeman". Each member of the crew had a two-way radio for his use in operating the train. At the time of the accident the conductor was not on the train, nor was he in a place where he might have relayed signals from the brakeman to the engineer. The crew was operating the train so that the engine was pushing a string of boxcars and this prevented the engineer from seeing down the track under the shed. The tail brakeman was walking along at the forward moving end of the string of boxcars. The head brakeman was riding the back of the engine and was not in a place where he could observe signals from the tail brakeman; nor could he have relayed visual signals to the engineer. Thus, it will be seen the only available method of communication between the brakeman and the engineer was the two-way radio in the hands of the brakeman at the forward end of the moving train. The radio had been operating properly during the afternoon and was found to be operating just before the train went under the shed at the loading dock.
As the train moved along the loading track toward the "stoppers" the appellee was observed going along the track with an armload of strips used to prepare the trucks for loading. The tail brakeman, who was walking along by the moving train, called to the appellee so as to warn him of the approaching train. The appellee quickened his pace and passed beyond the tracks and "stoppers" to the area where the trucks were being prepared for loading.
Before the train reached the end of the tracks, the tail brakeman became aware that the engineer was not stopping the train in compliance with his radio signal. He had not checked with the engineer since the train had moved under the loading dock. When he became conscious that the train would not stop, he ran toward the engine waving his lantern and "yelling". He did not warn the appellee that the train was out of control and would strike the "stoppers" at the point where he was working. The brakeman said he "almost panicked". The train moved on toward the end of the track. It struck the "stoppers" and the wheels stopped but the boxcar broke apart and continued on in the direction the train was moving. It struck the appellee breaking his right arm.
The appellant contends that the trial court was in error in failing to grant a peremptory instruction for the defendant railroad at the conclusion of all of the testimony because it is said the plaintiff failed to have proven any of the grounds of negligence based on the declaration.
It is argued that the plaintiff alleged that the defendant failed to have given adequate warning of the approach of *190 the train when it is said that the plaintiff admitted that the brakeman hollered at him as the plaintiff went along between the tracks. This is correct, but it is also true that the testimony shows that the plaintiff heeded this warning and walked rapidly to his place of work beyond the "bumpers", a place where he had a right to be and which was believed to be a safe place. The brakeman, however, did not warn him that the train was about to strike the bumpers and that an impending wreck was about to occur, although he knew this about a car length before it occurred. The reason for the failure of the brakeman to give this warning was that he was "about to panic". We think that the jury had testimony on which it could have concluded that the agent of the railroad knew of the impending danger and he failed to give the plaintiff the last clear chance to escape injury.
We are of the opinion that there was sufficient evidence on which to submit the issues to the jury.
The appellant argues, however, that in order to hold appellant for the injury to the appellee that the plaintiff should have offered testimony to show that the railroad could have reasonably anticipated that the radio would not function. The record shows, however, by the testimony of the engineer that the radio had failed before. The brakeman had a signal lantern but the engineer could not see him and there was no other agent to relay the lantern signal to the engineer. The brakeman kept talking on the radio and did not check to discover whether or not the engineer was receiving the information while he was "talking him down".
The appellant also contends that it was entitled to a peremptory instruction to two affirmative defenses offered by the defendant railroad: (1) The appellee, plaintiff, assumed the risk of being struck by the train; (2) The members of the switch crew operating the train involved were loaned servants to the paper company, the plaintiff's employer, and the railroad was not liable for the negligent acts of the switch crew because they were fellow servants of the paper company.
It is true that this Court has held that the common law rule of assumption of risk doctrine is in force in this state except as between master and servant. Saxton v. Rose, 201 Miss. 814, 29 So.2d 646 (1947).
In Saxton, supra, we pointed out, however, that before one may be charged with "assumption of the risk" he must voluntarily and knowingly place himself in a dangerous position appreciating that injury is likely to occur to him because of the assumed situation. In other words, he ventures himself into a known danger fully understanding the consequences. Acts of venturousness must have been the proximate cause of his injury. Otherwise, such an act, though dangerous, would only constitute contributory negligence where his injury was caused by another.
The common law rule that an employee while working for one person is directed by his employer to do a special job for another while, at the same time, retaining his employment with his general employer is sometimes referred to as the "loaned servant doctrine". Such a relationship requires that the employee submit himself to the direction and control of the other employer with respect to the work to be done. Sawmill Construction Co. v. Bright, 116 Miss. 491, 77 So. 316 (1918).
If, however, the original employer retains control over the means and method of the work done, the employee does not become a "loaned servant" although he is temporarily working on the job of another employer. The borrowed employer must have exclusive control and direction over the particular work in progress. Rodicker v. Illinois Central Railroad Co., 236 So.2d 414 (Miss. 1970); St. Louis-San Francisco Ry. Co. v. Porter, 211 So.2d 530 (Miss. 1968); Index Drilling Co., Inc. v. Williams, 242 Miss. 775, 137 So.2d 525 (1962).
*191 The test is whether, in the particular service which he is engaged to perform, he continues liable to the directions and control of his master, or he becomes subject to that of the party to whom he is lent or hired. Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed 480 (1909); Delory v. Blodgett, 185 Mass. 126, 69 N.E. 1078 (1904); Higgins v. Western Union Tel. Co., 156 N.Y. 75, 50 N.E. 500 (1898); Coughlan v. Cambridge, 166 Mass. 268, 44 N.E. 218 (1896). See also I.C.R.R. v. Humphries, 170 Miss. 840, 155 So. 421 (1934); Matthews v. New Orleans & N.E.R. Co., 93 Miss. 325, 47 So. 657 (1908); O'Neal v. Refuge Cotton Oil Co., 88 Miss. 617, 41 So. 67 (1906). A servant of an independent contractor is not a fellow servant of the employees of the principal although they are engaged in a common work. Louisville, N.O. & T.R. Co. v. Conroy, 63 Miss. 562 (1886).
The facts of the instant case are very similar to those in the case of Geraghty v. Lehigh Valley R. Co., 2 Cir., 70 F.2d 300 (1934); 1 A.L.R.2d 309, wherein the yardmaster of a smelting company, which was receiving freight cars from the defendant railroad company, directed the placement of the freight cars but did not have supervision and control over how the work was to be performed by the defendant-railroad's switching crew. In that case the injured railroad freight conductor was held not to be the servant pro hac vice of the smelting company.
The mere use of another's tracks by a railroad company does not make the servants of a railroad fellow servants of the owner of the used tracks. Chicago Terminal Transfer R. Co. v. Vandenberg, 164 Ind. 470, 73 N.E. 990 (1905); Louisville & N.R. Co. v. Martin, 113 Tenn. 266, 87 S.W. 418 (1905); Erickson v. Kansas City, O. & S. Ry., 171 Mo. 647, 71 S.W. 1022 (1903); Northern Pac. R. Co. v. Craft, 69 F. 124 (9th Cir.1895); Gross v. Pennsylvania P. & B.R. Co., 62 Hun. 619, 16 N.Y.S. 616 (1891); and Zeigler v. Danbury & N.R. Co., 52 Conn. 543, 2 A. 462 (1895).
We are of the opinion that the trial court was correct in refusing to submit to the jury the question as to whether or not the members of the train crew were loaned servants from the railroad to the paper company, because the testimony of the train crew shows that they received their orders from the train master each morning instructing them where to work. The train crew was employed by the railroad and did their work as directed by the railroad for the benefit of the railroad.
The head car checker at the paper company testified that he had no control over the train crew. He simply furnished the train crew with a list of freight cars needed and a list of cars previously loaded. The train crew pulled out the loaded cars and furnished the paper company with unloaded freight cars. It was said by the head car checker that the paper company paid the railroad for this service. In any case, however, it is clear that the employees of the railroad were not "loaned servants" to the paper company. The paper company did not own either the trains, the cars or the equipment used by the agents of the railroad. Nor did it control the activity of the employees in doing the switching required to deliver the freight cars to the paper company to be used in transporting the product over the railroad.
The authorities cited by appellant with reference to workmen's compensation cases are not in point in the instant case under the facts here shown.
It is the contention of the appellant that the trial judge committed a reversible error in making an adverse statement before the jury after the appellant had asked: "Have you been paying Dr. Enger or has International Paper Company paid Dr. Enger?"
"Mr. Murphy: Well, we've got Workmen's Compensation involved here.

*192 The Court: I know, Mr. Murphy, but what's he saying, I'm talking about, I'm sustaining his objection.
"The Court asked yesterday that whatever happened between International Paper Company and the defendant, whatever has been paid under Workmen's Compensation could not be given in litigating damages in this suit here. You all have said whatever this man recovered, if anything, then that would be a matter that he would have to pay back from what he did receive, medical compensation."
The appellant made no objection to the judge's statement at the time it was made. In fact, the appellant was permitted to continue this inquiry to show that the plaintiff had been paid workmen's compensation during his incapacity. The inquiry as to workmen's compensation was relevant only if it were determined that plaintiff and the members of the train crew were fellow servants.
Since there is not sufficient evidence shown in the record to require the Court to submit the issue of the loaned servant doctrine to the jury, there was no harm done by the statement of the trial judge. A trial judge can verbally state his reasons for sustaining an objection to an attorney even though his reason is based upon a legal principle without violating Section 1530 Mississippi Code 1942 Annotated (1956). See the cases cited in Ethridge v. Goyer Co., 241 Miss. 333, 131 So.2d 188 (1961).
An examination of all of the instructions given on behalf of the plaintiff and defendant and those rejected by the trial judge has been made, and we are convinced that there is not sufficient error in the instructions to warrant a reversal of this case. We think, however, that plaintiff's Instruction No. 5 was error because it tended to warrant a recovery by the plaintiff without proof of negligence.
Plaintiff's Instruction No. 6 assumes that operating the train in the manner shown by the proof involved "special dangers" without leaving it to the jury to determine whether or not the manner of operation involved "special danger".
There are many instructions given to the jury for the plaintiff and defendant and, with the exception of the foregoing instructions, they gave the jury a proper guide as to the applicable law.
The instructions on the "lent servant" doctrine offered by the defendant were properly refused by the court, because the testimony offered by defendant did not bring the case within facts necessary to show that the railroad crew was in fact lent servants of the Paper Company at the time of the accident.
The other instructions offered by the defendant peremptorily instructing the jury on each item of negligence alleged in the declaration, were properly refused because they were the subject of proof by the plaintiff and denied by the defendant, and were questions of fact for the jury.
An instruction on the assumption of risk doctrine was properly refused, there is no proof in this record on which to base such an instruction. The mere fact that the plaintiff crossed the tracks before the train arrived and went to his place of employment off the tracks does not mean that he assumed the injury caused by a train that followed him off the tracks and broke his arm.
Finally, it is argued with considerable energy that the verdict of the jury and judgment of the trial court in this case are excessive and not warranted by the evidence.
The appellant suffered a break of the radius in the right arm. He had a hospital and doctor's bill of two thousand fifty-one dollars and forty cents ($2,051.40). He will have another bill of at least one hundred seventy-five dollars ($175.00) to *193 two hundred twenty-five dollars ($225.00). He had a loss of wages in the sum of five thousand eight hundred sixty-two dollars and twenty-nine cents ($5,862.29). He suffered three operations and must undergo another. He suffered much pain for nineteen months and after he has recovered he will have a ten percent (10%) medical disability.
There are pictures in the record showing the condition of the plaintiff's arm from the outside. There are also X-ray pictures showing the various healing stages of the bones and the metal strips and screws in the bones.
The workmen's compensation benefits paid to the appellee by the International Paper Company, including medical services, will have to be repaid by the appellee. His record shows him to have been a hard-working faithful employee, who was entitled to have his claim for injury carefully considered by a jury. The jury returned a verdict in favor of the appellee in the sum of forty-five thousand five hundred dollars ($45,500.00). We are inclined to believe that the verdict is excessive in view of the statement of his doctor that he will have a recovery so that he may return to his normal employment with only a ten percent (10%) medical disability.
We have reached the conclusion that a new jury should pass upon the amount of the damages due to the appellee because of his injury; therefore, the judgment of the trial court will be affirmed as to liability but reversed as to damages and a new trial awarded only as to damages.
If, however, the appellee John Temple should file a remittitur with the Clerk of the Supreme Court of Mississippi indicating his willingness to reduce the judgment of the trial court in the sum of ten thousand five hundred dollars ($10,500.00), this Court will enter a judgment here in favor of the appellee John Temple in the sum of thirty-five thousand dollars ($35,000.00). Otherwise, the judgment of the trial court must be reversed and remanded for a new trial as to damages.
Affirmed as to liability; and reversed and remanded as to damages, unless remittitur entered.
JONES, BRADY, INZER and SUGG, JJ., concur.