### DALZELL v. THE ST. NICHOLAS et al.

### TODD SHIPYARDS CORP. v. LEE & SIMMONS, Inc.

### THE MICHAEL DALZELL.

United States District Court,
S. D. New York.

June 4, 1951.

Burlingham, Veeder, Clark & Hupper, New York City, for libellant, Stanley Wright, New York City, of counsel.

Hagen, Senecal & Eidenbach, New York City, for Lee & Simmons, Inc., Charles W. Hagen, Nelson J. Johnson, New York City, of counsel.

Crowell & Rouse, New York City, for Todd Shipyards Corp., George L. Varian, E. Curtis Rouse, New York City, of counsel.

CONGER, District Judge.

The two above-entitled actions were tried together. Both arose out of an accident occurring on October 15, 1943 while the tug Michael Dalzell was tied up at a pier adjacent to Dry Dock No. 2 in the repair yards of Todd Shipyards Corporation at Hoboken, New Jersey, when the mast and boom on the St. Nicholas, a derrick lighter, fell over and upon the tug.

In the first action the libel is against the St. Nicholas, *in rem* and against Lee & Simmons, Inc., as owners of the St. Nicholas *in personam* to recover for the damage to the tug Dalzell.

Respondent Lee & Simmons, Inc. filed a petition impleading Todd Shipyards Corporation, claiming that the damage to the tug was caused solely by the negligent operation of the St. Nicholas by Todd which had the lighter under charter at the time.

On the trial, libellant Dalzell made out a prima facie case and rested. Both respondents agree that libellant is entitled to a judgment for the damage sustained by the tug.

In the second suit, a libel was filed in the United States District Court for the Eastern District of New York by Todd Shipyards Corporation against Lee & Simmons, Inc. to recover for the cost of the repairs to the St. Nicholas. In this libel it is alleged that libellant Todd chartered the St. Nicholas from respondent and that while operating under the said charter the boom and derrick of the lighter collapsed resulting in serious damage to the lighter; that said damage was solely caused by the unseaworthy condition of the lighter; that Todd repaired the damage and is entitled to the cost of these repairs.

This second action was removed to this District and consolidated with the Dalzell action for purposes of trial.

On or about April, 1943 Todd chartered the St. Nicholas and the charter lasted until about September 12, 1943 when the St. Nicholas was laid up for repairs. It was again, on or about October 2, 1943, chartered by Todd for a period of six months and was still under charter when this accident occurred.

Each of these charters were made orally but each was in due time confirmed by a written "charter confirmation" sent by Lee to Todd. It is claimed by Todd that while they received this confirmation it was never accepted by them and, therefore, should have no effect nor weight in this case. I cannot agree with this contention. I feel that having received the confirmation and retained it and continued to operate the lighter, without objection as to the terms of the confirmation, they are bound by it. However, whether the lighter was operated under the claimed terms of the oral charter or under the charter as confirmed makes no difference, it seems to me, in arriving at the solution here.

The St. Nicholas is a derrick lighter with no propelling power, about 109 feet long

with a breadth of about 35 feet. It had a single mast of about 72 feet in height and 2 feet in diameter at the base and boom of 85.6 feet long. The lifting power was supplied by a steam engine.

There were two methods of using the boom. It could be attached to a deck step or it could be stepped to what is known as an upper step, which is 12 feet above the deck. By stepping the boom to the deck the lifting power is increased and the strain on the mast reduced.

On the morning of October 15, 1943, in the course of work at the Todd yards, it was necessary to have a certain rudder moved from Pier B to the apron of Dry Dock No. 2 on the south side of and adjacent to Pier B. It was generally understood that this rudder weighed about 5 tons. Later it was weighed and found to weigh 11,600 pounds. Todd's superintendent gave the orders for the work to be performed.

The rudder had been rigged by Todd's men with slings for hoisting the night before and was resting on a dolly on the deck of Pier B. Todd's superintendent ordered the St. Nicholas towed to the same side of Pier B for the purpose of making the hoist.

On arrival it was found that the Michael Dalzell was tied alongside of Pier B so that it was impossible to place the St. Nicholas alongside the pier and the St. Nicholas was, therefore, moored outside the Dalzell, and made fast with her aft corner tied to the portside midships of the Dalzell and her forward corner to the apron of the Floating Dry Dock No. 2. This left the St. Nicholas not against the flush with Pier B but with her forward end further away from the pier than her aft end, and with the Dalzell between her and Pier B.

There were two men on the St. Nicholas; the captain and the engineer. When the St. Nicholas was in the position as above stated her boom was let down and over the rudder. One of Todd's men was standing on the rudder. He made the line from the boom fast and gave a signal with his hand to those on the lighter to go ahead with the lift. This was done and one corner of the rudder went up when a crash was heard. The mast fell over and backward and hit the house of the tug. The boom also fell over and upon the tug.

An examination of the derrick's gear just after the accident showed that a chain link securing the forward port stay to the chain shackle had opened. This allowed the stay which had been supporting the mast to swing loose. It was noticed also that a second link on the aft port stay had parted.

The St. Nicholas was repaired by Todd but the bill has not been paid by Lee & Simmons, Inc. who now contest it here.

Todd sued Lee & Simmons, Inc. in the Eastern District for the cost of these repairs on the theory that Lee & Simmons had requested Todd to make such repairs and that, therefore, Todd had a maritime lien on the vessel for the cost of the repairs.

Judge Inch after a trial dismissed the libel holding that "Lee and Simmons did not order the repairs nor was there any agreement on the part of Lee & Simmons, Inc. to pay for said repairs." See Findings of Fact and Conclusions of Law by Judge Inch.

A second suit was then commenced by Todd in the Eastern District to recover for the repairs on the ground that the damage was the result of an unseaworthy condition of the St. Nicholas and of her gear. That is the second suit that was tried before me.

It is contended by Lee & Simmons, Inc. that this second action may not be sustained because the same cause of action had been tried and decided against Todd in the action tried before Judge Inch. I cannot sustain this plea of *res judicata* because it has already been passed on adversely to the party now asserting it. This case came to me with that issue already decided.

Exceptions to the libel in this second suit were filed by Lee & Simmons, Inc. on the ground that the libel (1) fails to state a cause of action, (2) to allege the facts upon which libellant relies to support its suit and (3) *res judicata.*

These exceptions to the libel were argued before Judge Kennedy of the Eastern District, D.C., 109 F.Supp. 442, who found

against Lee & Simmons, Inc. on all three exceptions.

Judge Kennedy held that the decree in the first action was not *res judicata* as to this suit. Judge Kennedy made the law of the case on this point. I have no alternative but to follow it.

At the opening of this trial, the attorneys for Lee & Simmons, Inc. moved to amend its answer to assert the plea of *res judicata*. I reserved decision on the amendment. I now allow the answer to be so amended, but hold against Lee & Simmons, Inc. on its contention by reason of the previous decision of Judge Kennedy.

As to the other two exceptions Judge Kennedy did nothing more than decide that the libel stated a claim that the proximate cause of the damage was the unseaworthiness of the St. Nicholas when she went on charter and that those were the facts upon which libellant relied. No implication affecting the merits of the issue here may be drawn from Judge Kennedy's opinion. He simply passed on the sufficiency of the pleading and held that it properly set forth a triable issue.

As to Dalzell, there is no dispute as to the right of the tug's owner to collect for the damage to it.

Todd says that the accident and the resultant damage to the tug was proximately due to the unseaworthiness of the St. Nicholas. Lee & Simmons, Inc. says that the accident was due solely to the negligent operation of the St. Nicholas while it was under charter to Todd.

Todd's contention is that Lee & Simmons, Inc. has the burden of showing that (1) the St. Nicholas was in seaworthy condition (with respect to her mast, chains and stays and fit for the purpose intended at the time it went on charter), (2) that the collapse was not the result of some duty for which the St. Nicholas or Lee & Simmons, Inc. is responsible, and (3) that the damage resulted from Todd's negligence.

■ As to (1), it seems to me the law is well settled. Lee & Simmons, Inc. had chartered the St. Nicholas. That charter carried with it a warranty of seaworthiness or fitness for the use that was required of her. This warranty need not be an express warranty but may be "implied by law." Shamrock Towing Co., Inc. v. Fichter Steel Corp., 2 Cir., 155 F.2d 69; Cullen Fuel No. 32, 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189.

■ I hold here that the so-called confirmation of charter was the final agreement between the parties, but that makes no difference as far as this issue is concerned. Whether the St. Nicholas was under charter under the charter confirmation or under the oral agreement claimed by Todd, the result would be the same. "The warranty of seaworthiness may be implied from the circumstances of the parties and the subject matter of the contract and may be negated only by express contract". Cullen Fuel, supra. There is no express waiver of the seaworthiness covenant here, so that when the St. Nicholas went to Todd (either by the verbal charter or by written contract as evidenced by the confirmation) she carried with her a warranty of seaworthiness.

Here Todd relies on the presumption (implied in law) that Lee & Simmons warranted the St. Nicholas to be seaworthy when it went on Charter and that Simmons has failed to meet the burden to show that the St. Nicholas was actually seaworthy when she entered upon the charter.

The attorneys for Lee & Simmons, Inc. stress the point that Todd was the charterer of the St. Nicholas and that there is an inference of negligence by Todd by reason of the damage.

■■ The rule is well settled that the bailee of a vessel does not discharge himself of the duty thrown upon him by returning it damaged unless he offers some evidence to show either how the injury happened and that his negligence did not cause it, or that however it did happen his fault had no part of it. This, assuming, of course, that the bailor shows delivery in good condition and return in damaged condition. He, in that event, has made out a prima facie case and becomes entitled to the benefit of a presumption of fault by the bailee. The burden then rests upon the bailee to go forward with evidence to overcome the presumption by showing that the damage was not caused by his negligence. Murray Lighterage &

Transportation Co. v. Penn. R. R., 2 Cir., 130 F.2d 199; The E. T. Halloran, 2 Cir., 111 F.2d 571.

Irrespective of the above presumptions each of these parties has accepted the challenge. Todd has attempted to show that the sole cause of the accident was the unseaworthiness of the St. Nicholas and that it did nothing in the handling of the St. Nicholas at the time of the accident which might be classified as negligence. Lee & Simmons, on the other hand, assert that the St. Nicholas was seaworthy and that the accident was caused not by any unseaworthiness of the St. Nicholas, but by the negligent manner in which the St. Nicholas was handled.

This brings up another question which should be settled at this time. Assuming that the accident was in whole or in part caused by the negligent operation of the St. Nicholas, and assuming that Captain Berg and engineer Nerheim of the St. Nicholas, in charge of its operation, might be said to have acted negligently, to whom may that negligence be imputed?

The rule is well settled. It was stated in Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480, and restated and adopted in Linstead v. Chesapeake & Ohio R., 276 U.S. 28, at page 33, 48 S.Ct. 241, 243, 72 L.Ed. 453, that:

"It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became *pro hoc vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still in its doing his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking."

Here Todd chartered the lighter and with it went the captain and the engineer, who still remained in the employ of Lee & Simmons, Inc., from whom they received their wages. To all intents and purposes, Lee & Simmons, Inc. parted with the possession and control of the lighter when it chartered it to Todd. It did not retain any control over the captain and the engineer. The work to be done was Todd's work. Where the lighter had to work, the character of the work to be done, and the manner of the doing of the work, was entirely at the will of Todd. All direction was given by Todd as to the management and control of the St. Nicholas while it was under charter to it.

I can only conclude that if the accident in question was in any way caused or contributed to by the negligence of the captain or engineer of the St. Nicholas, such negligence must be imputed to Todd.

In the last analysis, after all the testimony is in, on the whole case, the problem presented is, whose fault under the law may be said to be the proximate cause of the accident and the resulting damage to the tug Dalzell? Was it (a) caused by the

unseaworthiness of the derrick and its appurtenances or (b) was it caused by the manner in which the St. Nicholas was operated or (c) was it a combination of both? This last was not urged by any party here, but it is my own suggestion.

■ Todd contends that Lee & Simmons, Inc. has not carried the burden of establishing the seaworthiness of the St. Nicholas, but that on the contrary it appears from the evidence that the damage was solely the result of unseaworthiness. It contends that when the mast collapsed one end of the rudder had been lifted only 5 or 6 inches from the truck and before the other end had come clear; that the full weight of the rudder had not yet been carried when the chain link securing the forward port stay to the chain shackle had opened at a defective scarf weld; that a similar link on the aft port stay had parted apparently from the strain thrown upon it when the defective forward link opened; that a stay had parted under the splicing to the chain link at a point where it had become deteriorated to such an extent that half the original strength remained; that as a result the mast broke off at its base and the boom collapsed; that the stub of the mast showed advanced dry rot in the core for a diameter of 8 inches.

Lee & Simmons, Inc., on the other hand, contend that the accident was not caused by any unseaworthiness of the lighter, but solely by the negligent manner in which the lifting was done; that by reason of the position of the lighter the boom was extended at an angle of 57° to 65° from the mast; that when the lift was being attempted this put an undue strain on the stays as a result of which a link on one of the stays supporting the mast gave way. A second link broke and then the mast cracked at its base and fell over; that an angle of over 45° for a boom puts an inordinate strain on the stays and riggings; that under the direction of Todd's employees, and against the protests of Captain Berg; the lighter was being used with her boom in an improper position.

The solution of the problem before me ordinarily would not be difficult of solution. The law is well settled but the factual setting of the case presents much difficulty, which is complicated by the contradictory testimony of the witnesses. On matters over which one would not expect a dispute, the witnesses (and apparently reliable witnesses) on the one side, swear to a certain fact only to be flatly contradicted by apparently equally responsible witnesses on the other side. These contradictions are such that they may not be reconciled. Frankly, on most of the important issues of fact I am not too sure just where the truth is. I have had to use a rule of common sense of probability, buttressed by extraneous circumstances, to arrive at a result which I believe to be correct and proper under the law and the evidence.

At the very outset it was material to ascertain just what the lifting capacity of the St. Nicholas was. The transportation superintendent of Todd testified that he hired the St. Nicholas from Lee & Simmons, Inc. with the understanding that she had a capacity to lift 10 tons. On the other hand the secretary of Lee & Simmons, Inc. testified that the lighter had a 5 ton capacity and that he did not charter her as a 10 ton derrick.

I have come to the conclusion that the St. Nicholas had both a 5 ton as well as 10 ton lift capacity. She could be used for 5 or 10 ton lifting. If the boom is stepped up on the mast it had a 5 ton capacity and if stepped down near the deck it had a 10 ton capacity. This fact was known by at least one of Todd's superintendents (Anderson).

It was the job of Captain Berg of the lighter (with assistance) to lower or step up the boom in the mast. There is no evidence, however, that he was ever asked to lower the boom on this occasion. There is no evidence that he was ever told the exact weight of the rudder to be lifted. There is no evidence that Todd's men knew the exact weight of the rudder. It was weighed afterward.

Under all the circumstances, with the lighter away from the pier and the boom at an angle of at least 57° from the mast, I feel that it was the duty of Todd to at least order Captain Berg to lower the boom to the deck. That would be a safer

operation. The work was being directed by Todd's men. They gave the signal to lift. Berg was on the lighter. He claims he protested the lifting as it was being done; that the rigger boss gave orders to the engineer on the lighter to lift the rudder; that he (Captain Berg, when the lighter was being tied up) shouted to the riggers to get the "tugboat out of the place so that we could get into the place to play safe"; that he (Berg) was arguing with the rigger when the signal to hoist was given. Just as the hoisting was started the accident took place. Captain Berg further testified and he was corroborated by the engineer that the signal to hoist was given by one of Todd's employees and not by Captain Berg.

There is testimony on the part of Todd's riggers that Captain Berg came out to look at what was to be hoisted and then went back to his station on the lighter; that they heard him say nothing. One of the riggers for Todd did testify that just before the lifting began he saw Captain Berg talking to the gang foreman (Snapper), but he did not hear the conversation.

I have come to the conclusion that Captain Berg did make the protest set forth above. Even if he had not I cannot see that it changes the situation any. In the last analysis it was Todd's work, directed by them. They were responsible for the hoisting. They had placed the lighter in a position which was not usual nor customary. By reason thereof the boom on the derrick had to be lowered to such an extent that the boom was at an angle of 57°.

It was generally agreed by the qualified witnesses on both sides that it was better practice in hoisting to have the boom as nearly perpendicular as possible and usually at no greater angle than 45°. Swinburne, the surveyor for Todd, testified that it was improper to place a derrick lighter so that its maximum lift was made with a tug boat between the derrick and the dock and that in making a heavy lift from the dock the vessel should be placed as close to the dock as possible and further that assuming that this is a 5 ton lift vessel that it would not be proper to lift 11,600 pounds with the boom at an angle of 57°; that there was no factor of safety there.

In the hoisting operation if any negligence may be imputed to Captain Berg such negligence must be attributed to Todd for the reasons which I have heretofore set forth. I feel that Todd's employees directing the operations should not have permitted the St. Nicholas to make the lift under the circumstances (a) with the lighter in the position that it was—away from the pier; (b) with the boom stepped up on the mast as it was and (c) with the boom at the angle of at least 57°.

As I have stated before, Todd attempted to prove that the lighter was unseaworthy in four respects. I shall take them up separately.

It is claimed that one of the stays had parted under the servage or splicing to the chain link. There were two witnesses who testified that the stays were ruptured and deteriorated. The evidence is not clear enough for me to draw a conclusion that the stays or any one of them completely parted or that the condition of the stays in any way contributed to the mast falling. One of the surveyors (Mr. Swinburne) testifying for Todd stated that he examined the stays and found them parted; "that they were considerably corroded and the estimate was about, I think, pretty nearly about 30 per cent of the strength remained in the stay when it collapsed or before it collapsed." This would indicate that the stay or stays had not broken off. I agree with Mr. Swinburne that "when the thing collapsed such as that did there is no telling what happened in the subsequent strains that are put on all sorts of the gear, when it comes down like that."

The reports submitted by the surveyors would seem to indicate that the stays themselves were not broken. Both reports state that the mast was broken; that the boom was broken but as to the stays one states "six stays damaged and the other stays strained."

There is no dispute about the opening of the chain link securing the forward port stay and that a chain link on the aft port stay parted. This, of course, would take away from the mast the support of these

stays. Todd claims that the chain link on the forward port stay had opened because of a defective weld. There was a defect in this chain link, at the place where the link had been welded.

Horowitz, an expert for Todd testified that this link was defective because it had been improperly welded; that as a result there was a complete lack of fusion in the central position of the weld; that this would reduce the strength of the weld considerably under the strength of what a normal sound link would have been. Finkenaur, the expert for Lee & Simmons agreed that there was a defective weld in this link as testified to by Horowitz, but he stated that the link, defective as it was, would still have 80% of its original strength. Horowitz testified that the link would still hold 12 tons before it broke and that with this defective weld it still had 50–60 per cent of its original strength.

The mast itself, in my opinion, was defective in that the heart of the mast at the base where it broke off was dry rot for about 8 inches in diameter.

There was still much strength left in both the mast and link if no undue strain was put upon them.

I find that the St. Nicholas was not seaworthy because of this defective link and mast.

If this unseaworthiness were the sole proximate cause of the collapse of the mast, then Lee & Simmons would be responsible for the consequent damage. I am not convinced that such unseaworthiness was such sole proximate cause. I have come to the conclusion that the collapse of the mast was caused jointly by (a) the unseaworthiness, which I have described above, and (b) the improper and negligent manner in which the derrick was used on this day.

The combination of these two caused the link to open up and give way and the mast to break off. Therefore, I believe that the damage to the Dalzell should be borne equally by Todd and Lee & Simmons. C. R. Sheffer, 1936 A.M.C.1658.

The next issue for decision is whether or not Todd may recover from Lee & Simmons for the repairs which it performed on the St. Nicholas caused by the collapse of the mast and boom due to the unseaworthiness of the St. Nicholas. I have already discussed the nature of the cause of action. A decision in favor of Todd cannot be based on any promise, express or implied by representatives of the owner to pay for the repairs. That was passed on by Judge Inch.

This very question was passed on adversely to Lee & Simmons by Judge Kennedy on a motion addressed to the pleading. Whether his decision is the law of the case or not I am content to follow it. I can do no better than adopt the language of Judge Kennedy in passing on this question:

"But, even assuming that to be so, there are circumstances under which a demise charterer can make the owner liable for necessary services to the ship, e. g., The J. W. Hennessy, 2 Cir., 1932, 57 F.2d 77, and, on principle, I do not see why, if the proximate cause of the damage to the chartered ship was her unseaworthy condition when she went on charter, the owner cannot be held liable to the demise charterer for the reasonable cost of such repairs, even where the latter has made them himself." 109 F.Supp. 442, 443.

I find that one of the proximate causes of the damage to the St. Nicholas was her unseaworthy condition when she went on charter and, therefore, that Todd having made the repairs should be compensated by Lee & Simmons for their reasonable cost. However, I have decided here that the accident causing the damage to the St. Nicholas was caused also by the negligent handling of the St. Nicholas by Todd. In view of the dual fault of Todd and Lee & Simmons the damages should be divided.

Libellant Dalzell and libellant Todd are entitled to a decree in accord with this opinion.

Settle decree on notice.