LINSTEAD, EXECUTRIX, *v.* CHESAPEAKE & OHIO
RAILWAY COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
SIXTH CIRCUIT.

No. 171.   Submitted January 11, 1928.—Decided February 20, 1928.

Train crews of the Big Four Railroad, operating under a reciprocal
    arrangement for freight exchange between it and the C. & O. Rail-
    road, ran Big Four locomotives and cabooses from the common
    terminal over a twelve-mile stretch of C. & O. track, on which were
    several stations, to a point on the C. & O. where they picked up
    trains of freight cars destined for the Big Four and returned with
    them to its line.   Though the men were paid by the Big Four and
    subject to discharge or suspension only by it, the traffic was C. & O.
    traffic, paid for under its tariffs, and the work was done under the
    rules of that railroad and under the immediate supervision of its
    trainmaster.

*Held* that a member of such a crew, injured while so engaged, was *pro hac vice* an employee of the C. & O. Railroad, within the Employers' Liability Act.  P. 32.

14 F. (2d) 1021, reversed.

CERTIORARI, 273 U. S. 690, to a judgment of the Circuit Court of Appeals, reversing a judgment recovered by the above-named petitioner in an action under the Federal Employers' Liability Act, for the death of her husband in an accident on the Chesapeake & Ohio Railway.

*Mr. John W. Cowell* was on the brief for petitioner.

*Mr. Frank M. Tracy* was on the brief for respondent.

Linstead was not an employee of The Chesapeake & Ohio Railway Company within the meaning of the Federal Employers' Liability Act.  *Hull* v. *Philadelphia & Reading Rwy.*, 252 U. S. 475; *Wagner* v. *C. & A. R. R.*, 265 Ill. 250; *M. K. & T. Rwy.* v. *West*, 38 Okla. 581; *M. K. & T. Rwy.* v. *Blalack*, 105 Tex. 296; *Drago* v. *Central R. R.*, 93 N. J. L. 176.

The case at bar can not be distinguished from the *Hull* case, either upon the ground that the Big Four did not retain control over Linstead after he went upon the lines of the Chesapeake and Ohio Railway Company, or upon the ground that Linstead, when on the lines of the Chesapeake and Ohio Railway Company, was doing the work of that Company and not work of the Big Four Company.

Linstead's service was for his own company, as was Hull's.  In each case the employee is subject to the rules and regulations of the connecting carrier when on its lines.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This was an action under the Federal Employers' Liability Act against the Chesapeake and Ohio Railway Com-

pany, of Virginia, by Katherine Linstead, as executrix, to
recover damages for the death of her husband, who was a
conductor in the employ of the Cleveland, Cincinnati,
Chicago & St. Louis Railway Company, known as the
Big Four, but who was working upon a freight train run-
ning upon the Chesapeake & Ohio Railway Company's
tracks between Stevens, Kentucky, and Riverside, Ohio,
near Cincinnati. The question in the case is, for whom
he was working when he was killed, whether for the Chesa-
peake & Ohio Railway Company, the respondent, or the
Big Four Company. He was one of a train crew of the
Big Four Company composed of an engineer, a conductor
and two brakemen. The Chesapeake & Ohio Company
comes from the east to Cincinnati along the southern bank
of the Ohio River and crosses that river at Cincinnati.
The Big Four Company has no line in Kentucky but re-
ceives traffic and business from the Chesapeake & Ohio
Company at Cincinnati, or near thereto on the north side
of the river, delivering the traffic to the northwest. The
terminal yard, so-called, of the Chesapeake & Ohio reaches
from a station called Stevens, in Kentucky, for some twelve
or thirteen miles to Riverside, near Cincinnati on the
Ohio side, and in this twelve or thirteen miles the Chesa-
peake & Ohio line passes five stations, called Brent, Alta-
mont, Newport Waterworks, Brick House and Cold
Haven, and over an Ohio River bridge. It is convenient
for both railroads in the interchange of traffic to make
an arrangement by which the Big Four lends to the Chesa-
peake & Ohio a locomotive and caboose and a train crew
to take the freight trains that come into Stevens, Ken-
tucky, from the east to the Big Four Company at River-
side, Ohio, over the rails of the Chesapeake & Ohio. The
Chesapeake & Ohio does not pay the Big Four Company
any rental for the lending of its locomotive and caboose
and crew in this matter, but it pays the consideration by
a reciprocal service rendered to the Big Four by a train

crew and locomotive and caboose of the Chesapeake & Ohio. When the Big Four train crew and locomotive and caboose run on the track of the Chesapeake & Ohio between Stevens and Riverside, near Cincinnati, they are furnished with time-tables and rule books of the Chesapeake & Ohio Railway. They are under the supervision and control, so far as their work is concerned, of the train master of the Chesapeake & Ohio Company, whose jurisdiction reaches from Stevens to Riverside in the operation of the Chesapeake & Ohio road. The Big Four crew is not subject to discharge by any officer of the Chesapeake & Ohio road. In the operation of the train over the Chesapeake & Ohio line, they obey the signals of the switch tenders of that company and comply with the rules for operation on its line. The Big Four crew attends to nothing while on the Chesapeake & Ohio line but the train which it is sent over to Stevens to bring to the junction point at Riverside on the Ohio side. All of the members of the train crew, including the deceased, were paid by the Big Four Company.

On the morning of the accident, Linstead, the deceased, as conductor, had brought over his crew with the Big Four locomotive and caboose to Stevens, had attached the locomotive and caboose to a train of cars containing twenty-two loads and eighteen empties, and was proceeding to take them to Cincinnati and the junction with the Big Four load. The train had proceeded only a few miles on the Chesapeake & Ohio track when it was overtaken and run into by a commutation passenger train of the Chesapeake & Ohio Company running from Stevens to Cincinnati and back again. It was a train operated by the Chesapeake & Ohio Railway for the convenience of early morning passengers, and was not on the time-table. It was called the " Chippy." Linstead was in the caboose at the rear of his freight train. The caboose was shattered to pieces and Linstead was killed.

The trial was had in the District Court in Kentucky, held at Covington, and in the charge the Court used this language, which was duly excepted to:

"First, under the evidence here, you are authorized to believe, you couldn't find otherwise, that the Chesapeake and Ohio Railway is a common carrier engaged in interstate commerce, carrying freight and passengers between the states.

"Second, under the evidence you would be authorized to find, you couldn't find otherwise, that the defendant, her husband, on the occasion of the injury was in the employ of the Chesapeake & Ohio Railway Company and engaged in interstate commerce work."

The result of the trial was a verdict for $16,500, upon which judgment was entered.

By writ of error, the case was carried to the Circuit Court of Appeals. That Court, by *per curiam*, reversed the judgment and remanded the case for further proceedings. The language of the Court was:

"We are unable effectively to distinguish the facts of this case from those of *Hull* v. *Philadelphia, etc., Ry.*, 252 U. S. 475,—an opinion which apparently was not brought to the attention of the trial court." The judgment of the Circuit Court of Appeals was brought here by certiorari. 273 U. S. 690.

The legal consequences of the relation between one in the general service of another who is in the special service of a third person are set forth in the case of the *Standard Oil Company* v. *Anderson*, 212 U. S. 215, 221. In that case the plaintiff was employed as a longshoreman by a master stevedore, who under contract with the defendant was engaged in loading a ship. The plaintiff was working in the hold, where, without fault on his part, he was struck and injured by a draft or load of cases containing oil, which was unexpectedly lowered from a winch, and the question presented was whether the winchman whose negligence

probably produced the injury was the servant of the owner of the ship or of the stevedore. After reference to the opinion of Chief Justice Shaw in the case of *Farwell* v. *Boston & Worcester Railroad Corporation,* 4 Metcalf, 49, this Court said that the master was answerable for the wrongs of his servant, not because he had authorized them nor because the servant in his negligent conduct represented the master, but because he was conducting the master's affairs, and the master was bound to see that his affairs were so conducted that others were not injured, and that this principle rested on the great principle of social duty adopted from general considerations of policy and security. The opinion continues:

" The master's responsibility cannot be extended beyond the limits of the master's work. If the servant is doing his own work or that of some other, the master is not answerable for his negligence in the performance of it.

" It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is

done for the ultimate benefit of the other, it is still in its doing his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary coöperation, where the work furnished is part of a larger undertaking."

Now the work which was being done here by Linstead and his crew was the work of the Chesapeake & Ohio Railway. It was the transportation of cars, loaded and empty, on the Chesapeake & Ohio Railway between Stevens and Cincinnati. It was work for which the Chesapeake and Ohio road was paid according to the tariff approved by the Interstate Commerce Commission; it was work done under the rules adopted by the Chesapeake & Ohio Railway Company; and it was done under the immediate supervision and direction of the trainmaster in charge of the trains running from Stevens to Cincinnati, and that trainmaster was a superior employee of the Chesapeake & Ohio road. We do not think that the fact that the Big Four road paid the wages of Linstead and his crew or that they could only be discharged or suspended by the Big Four, prevented their being the servants of the Chesapeake & Ohio Company for the performance of this particular job.

The case of *Hull* v. *Philadelphia & Reading Railway Company,* 252 U. S. 475, which controlled the view of the Circuit Court of Appeals, is to be distinguished from this. In that case, Hull, the plaintiff's deceased, was in the employ of the Western Maryland Railway Company as a brakeman and was killed. The Western Maryland Company was an interstate carrier operating a railway from Hagerstown, Maryland, to Lurgan, Pennsylvania,

at which point it connected with a railway owned and
operated by the defendant, the Philadelphia & Reading
Railway Company, which extended from Lurgan to Ruth-
erford in Pennsylvania. By arrangement between the
two companies, through freight trains were operated from
Hagerstown to Rutherford, one-half over one line, and
one-half over the other, and each company ran its own
locomotives and freight trains over the united line from
Hagerstown to Rutherford, observing the rules of each
company on its respective line. It was held that Hull
was not a servant of the Philadelphia & Reading Com-
pany, by which he was killed, but only the servant of
the Western Maryland Company. That was because the
work which Hull was doing was the work of the Western
Maryland Company, even though it was carried on for a
part of the way over the rails of the Philadelphia & Read-
ing Company. The locomotive belonged to the Western
Maryland Company, the cars belonged to the Western
Maryland Company and the loads that were carried were
being carried for the Western Maryland Company, and
presumably the rates which were received for the trans-
portation were the receipts of the Western Maryland
Company. In other words, the whole line between
Hagerstown and Rutherford was exactly as if it had
been jointly owned by the two companies, and jointly
used by them for their freight trains. Therefore the
work was done by the Western Maryland for itself and
the mere transfer of the train owned by the Western
Maryland and operated by it on to the rails of the Phila-
delphia & Reading Railway did not transfer the relation
of the deceased from the general employment of the
Western Maryland to a special employment by the Phila-
delphia and Reading as another master.

In the present case there was such a transfer and the
line over which the transportation was effected and on
which the work of transportation was done by the de-

ceased was the line of the Chesapeake & Ohio, which was master and remained in charge of the operation, with the immediate supervision of the Big Four crew which was lent for the very purpose of doing the work of the Chesapeake & Ohio.

For these reasons, the judgment of the Circuit Court of Appeals must be reversed and the judgment of the District Court of Kentucky restored.

*Reversed.*