ETHRIDGE, Chief Justice:
This is an appeal from a jury verdict and judgment of the Circuit Court of Marshall County, awarding damages to ap-pellee, Mrs. Ruby L. Porter, administratrix of the estate of James A. Porter, deceased, who allegedly was killed while an employee of the St. Louis-San Francisco Railway Company (hereinafter called Frisco), appellant. The suit is not a common-law action in tort but is based solely upon the Federal Employers’ Liability Act. 45 U.S. C.A. §§ 51-60 (1954). A suit for damages under that statute may be brought by “any person suffering injury while he is employed” by a railroad, or “in case of the death of such employee,” by his personal representative for the benefit of his survivors. 45 U.S.C.A. § 51 (1954). Hence in order for recovery to be justified in this case, appellee’s decedent must have been an employee of Frisco at the time he was killed. After careful examination of the facts and pertinent law, which is determined by the federal decisions, we conclude that Porter was not an employee of Frisco, under either the loaned servant or dual employment doctrines. Accordingly, the judgment of the circuit court is reversed, and judgment is rendered here for appellant.
I.
Porter was a switchman employed by the Union Railway Company (hereinafter called Union), in the City of Memphis, Tennessee, at the time he met his death on September 9, 1961. Union is a switching or belt line around the City of Memphis, serving various industries and Missouri-Pacific trains. In 1962 appellee filed this suit in the Circuit Court of Marshall County, Mississippi. Frisco removed it to the Federal District Court for the Northern District of Mississippi. That court overruled plaintiff’s motion to remand, on the ground that Porter was not an employee within the meaning of the FELA. After amending her complaint, plaintiff conceded that she alleged no cause of action except under the FELA, so the district court gave a summary judgment for defendant. On appeal, the United States Court of Appeals, Fifth Circuit, held that the general allegation that Porter was an employee of Union did not “preclude plaintiff from showing, if she can, that under the circumstances that existed at the time of the injury Porter was an employee of Frisco within the meaning of that term as it is used” in the FELA; and that under some circumstances one may be the servant of two masters, or a loaned servant. Porter v. St. Louis-San Francisco Ry., 354 F.2d 840 (5th Cir.1966). Thus the Court of Appeals directed remand of the case to the state court, which was done, and the present trial ensued.
We will assume that under federal decisions there was enough evidence to make jury issues of whether Frisco was negligent, and whether such negligence contributed to Porter’s death. We do not, however, reach these or any other issues raised in appellant’s brief, except that relating to the employment relationship. Neverthe *532 less, a brief outline of the facts as presented by the opposing parties is essential for an understanding of the employment issue.
At the time of his death, Porter was a switchman in the general employ of Union. He had worked for Union for fifteen years and had received his pay exclusively from it. On the night of the accident, a Union switching crew, of which Porter was a member, was directed by the Union yardmaster to transfer a string of thirty-nine cars assembled in the Union yard to the Frisco yard. The crew was composed entirely of Union’s employees. The time of making delivery of the cars to Frisco was fixed by Union without notice to Frisco, and the delivery was made under the orders of Union’s yardmaster. Scoggins, the crew foreman, had received instructions from his yardmaster to make the Frisco delivery out of cars on two designated Union tracks.
A Union engine was coupled on the west end of the cut of thirty-nine cars and pulled along Union’s track until the last car of the cut was west of the switch into Frisco’s McLemore No. 1 switch track. Scoggins walked toward a little shanty and asked the Frisco yardman whether Mc-Lemore No. 1 was clear. He replied that it was, “except for one car on the far end.” The Frisco yardman gave him no instructions, only that information. After the switch was thrown the Union engine began pushing the string of cars on the Frisco track. Apparently Scoggins was on the ground at that time, and Porter passed him riding on top of the third car from the front end of the string being pushed onto McLemore No. 1. Scoggins told him what the Frisco yardman had said, and Porter replied, “O.K.”
On the afternoon before the accident, a Frisco crew had shoved a loaded, covered hopper car containing animal feed onto the McLemore No. 1 track. Defendant’s witnesses testified that they left it with hand brakes locked at the “dead end of McLe-more 1 track.” Plaintiff’s theory was that the hopper car was not placed at the end of that track, but was left some distance further up it.
After the Union engine had been returned to the Union yard, Porter was discovered missing. Upon a search of the Frisco yard, his body was found severed on the track, with his lighted lantern in his hand. The covered hopper car, placed on the track the previous afternoon by the Frisco crew, was found coupled to the cut of thirty-nine cars, but without air connection. The two cars at the end of the cut were gondola cars, upon which Porter could not walk. It was plaintiff’s theory that the hopper car had not been placed at the end of McLemore No. 1 track, but several hundred feet from the end; that it was dark that night and a neon sign on an adjacent building rendered visibility difficult; that Porter relied upon misinformation given Scoggins by Frisco’s yardman; and that when the cut of thirty-nine cars collided with the parked hopper car, Porter, riding on the third car from the head of the cut, was thrown off and killed. Witnesses for plaintiff stated that three car lengths from Porter’s body they found a grayish-white substance on the ground next to the track, which was similar to the feed on- the exterior of as well as in the hopper car. They found blood on a front wheel of the fourth car from the hopper car. Some of the evidence indicated that colliding with a loaded hopper car with hand brakes set would cause a substantial impact to the first ten cars of the string.
On the other hand, the defendant’s version of the facts was that there were no eyewitnesses to the accident, and no one had personal knowledge as to why or how Porter was killed. The plaintiff’s evidence, defendant contends, is highly conjectural and speculative. Measurements made on the night of the accident, offered by defendant, indicated that the lead car of the cut could not have come in contact with the hopper car, which direct testimony showed was several hundred feet down the *533 track, until after Porter had already been run over and killed.
At the close of the evidence, the circuit court peremptorily instructed the jury that Porter was an employee of Frisco at the time of his death within the terms of the FELA, and submitted the case to the jury on the questions of negligence and proximate cause. We have concluded that the granting of the plaintiff’s peremptory instruction was error and that the defendant itself was entitled to its requested peremptory instruction. Plaintiff-appellee failed to offer sufficient evidence to make a jury issue as to whether Porter was an employee of Frisco within the purposes and intent of the FELA and the federal decisions interpreting that statute.
II.
Porter had been employed by Union for many years. It directed his work and paid his wages. At the time of the accident he was engaged in performing work for Union as a member of its switching crew. He rode a car, shoved by a Union engine, from the Union into the Frisco yard solely for the purpose of delivering the cars to Frisco. They had never been in Frisco’s possession. In doing this work, Porter, employed and paid by Union, was performing work for it under orders from the Union yardmaster and foreman. He was paid nothing by Frisco and received no orders from it. He was not authorized to and did no switching for Frisco.
Appellee relies upon two propositions: the loaned servant and dual employment doctrines, which here are in some respects co-extensive. It is argued that under the FELA cases, Porter was a loaned servant of Frisco. This contention is based upon several factors. Porter was killed while he was working on a switching operation by Union on the Frisco tracks. He and his fellow crew men were governed by Frisco’s Uniform Code of Operating Rules while on the Frisco track. The record indicates no specific application of Frisco rules to the Union crew on this occasion, except the statement by the Frisco yardman to Scoggins that McLemore No. 1 was clear except for a car at the far end. There is no evidence that Frisco directed or controlled the movement of the Union crew while on Frisco’s track on this particular switching operation.
There is general testimony by several witnesses for plaintiff that, when Union shoved the cut of cars on McLemore No. 1, the Union crew was under the direction and control of Frisco. However, these statements are general conclusions of the witnesses. They are refuted by the undisputed fact that the only thing Frisco did was to designate the switch track for the string of cars when it was delivered. Direction and control of the Union crew was by Union and its yardmaster and foreman. Union was acting somewhat like an independent contractor. It is a Memphis belt line engaging in switching activities for private industries and railroads. This-is illustrated by the fact that subsequently Frisco paid Union $88.83 for the delivery by Union of the cut of cars onto the Frisco track. The statement by the Frisco yardman to Scoggins as the string of cars moved on McLemore No. 1 was not direction and control, but information for the convenience and safety of both Union and Frisco. Movement of the string of cars by Union to the Frisco track was for the benefit of Union, which received a fee for this service, as well as for the benefit of Frisco.
These conclusions, we think, are in accord with the FELA, which requires Porter to have been an employee of Frisco at the time of his death, and with the decisions of the United States Supreme Court and other federal courts, which are controlling on this issue.
Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909), does not involve the FELA but is a leading *534 case on the loaned servant doctrine. The Court there said:
One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation.
* * Jfc # * *
It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men become pro hac vice the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,' — a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking. Id. at 220-222, 29 S.Ct. at 253-254, 53 L.Ed. at 483-484.
These rules were applied in Hull v. Philadelphia & Reading Railway Company, 252 U.S. 475, 40 S.Ct. 358, 64 L.Ed. 670 (1920). Hull was in the general employ of Western Maryland Railway Company in Pennsylvania, which connected with the Philadelphia and Reading Railway and ran into another city. Through freight trains were operated from the WM to the P&R. Hull was a brakeman on a WM train which was to run over the tracks of the P&R. Before starting, the WM crew received instructions from the P&R yardmaster as to operation of the train, including directions to pick up seven cars at a certain town. While the WM crew was getting these cars on the P&R track, Hull was killed. The railroads had a contract for cooperating and supplementing their services on both roads. Affirming a directed verdict for the P&R, the Court said:
[I]n the Employers’ Liability Act Congress used the words “employé” and “employed” in their natural sense, and intended to describe the conventional relation of employer and employé. The simple question is whether, under the facts as recited and according to the general principles applicable to the relation, Hull had been transferred from the employ of the Western Maryland Railway Company to that of defendant for the purposes of the train movement in which he was engaged when killed. He was not a party to the agreement between the railway companies, and is not shown to have had knowledge of it; but, passing this, and assuming the provisions of the agreement can be availed of by petitioner, it still is plain, we think, from the whole case, that deceased remained for all purposes- — certainly for the purposes of the act — an employé of the Western Maryland Company only. It is clear that each company retained control of its own train crews; that what *535 the latter did upon the line of the other road was done as a part of their duty to the general employer; and that, so far as they were subject while upon the tracks of the other company to its rules, regulations, discipline, and orders, this was for the purpose of coordinating their movements to the other operations of the owning company, securing the safety of all concerned, and furthering the general object of the agreement between the companies. (Id. at 479-480, 40 S.Ct. at 359-360, 64 L.Ed. at 673).
In the instant case, as in Hull, it is clear that Union retained control of its own train crew and that what the Union crew did upon the switch track of Frisco was done as a part of its duty to the general employer. And so far as they were subject to the rules and regulations of Frisco while on its switch track for a short time, this was for the purposes of coordination, safety, and facilitating delivery of the cars to Frisco.
Linstead v. Chesapeake & Ohio Railway Company, 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453 (1928), distinguished Hull and affirmed a jury finding that the injured plaintiff was a loaned employee of the Chesapeake & Ohio Railway Company. Linstead’s general employer was the Big Four Railroad. There was a thirteen-mile stretch of C&O track below Cincinnati into Kentucky, as to which the two railroads made an arrangement for Big Four to lend tO' the C&O a locomotive, caboose and train crew to transfer freight trains to the Big Four over the rails of the C&O. The latter paid no rental for this locomotive and crew but rendered reciprocal service. When traveling over this thirteen-mile stretch, the Big Four train crew was furnished with time tables and rule books of the C&O and was under the actual supervision and control of its trainmaster. The Big Four locomotive was pulling a train of cars over this stretch of the C&O when it was run into by a C&O train, causing Linstead’s death.
The distinction from Hull, the Court said, was that Linstead and his crew were doing the work of the C&O, transporting the cars over the thirteen-mile stretch, under the rules of the C&O and the immediate supervision and direction of its trainmaster in charge of trains of this stretch of C&O track. For this period there was a transfer of the relation of Linstead from the general employment of Big Four to a special employment by C&O. In contrast, Hull was doing the work of the WM and for its benefit. The mere transfer of the WM train to the rails of the other road did not transfer the relation of Hull from his general employment to a special employment. In effect, Linstead, by again applying the common law criteria for a loaned servant, reaffirmed the result reached in Hull.
It is noteworthy that Linstead’s crew carried cars for which the C&O was responsible and which had come into its possession. In the instant case, Porter was transporting cars for which Union was responsible, and which had not come into Frisco’s possession at the time he was killed. He was engaged in Union’s business, and was employed by it.
The most recent Supreme Court decision, on point, Shenker v. Baltimore & Ohio Railroad Company, 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963), supports the conclusion that Porter was not a loaned servant of Frisco. In Shenker, plaintiff was employed by the B&O at a station in Pennsylvania where there were two tracks owned and operated by the B&O, and two by the Pittsburgh and Lake Erie Railroad. The B&O maintained a station and station facilities, and, although the P&LE maintained a station, it had no employees, all necessary services for the two stations being provided by B&O employees. On the date of the accident, Shenker handled the mail for the P&LE train. He loaded twenty-five bags on a B&O wagon at the B&O station and pushed it across the tracks to the P&LE *536 platform. While loading through a mail car door with the assistance of a P&LE baggageman, Shenker received a ruptured disc. He sued both railroads. The district court directed a verdict in favor of the P&LE, and the jury returned a verdict for plaintiff against the B&O. The Supreme Court, applying the common law loaned servant doctrine as defined in Standard Oil Company v. Anderson, affirmed. The Court stated that the immediate control and supervision is critical when determining for whom the servant is performing services, and held that the fact that Shenker might have been given some directions by the P&LE baggageman “is at most an example of the minimum cooperation necessary to carry out a coordinated undertaking, and, as noted in Anderson, cannot amount to control or supervision.” Id. at 6, 83 S.Ct. at 1671, 10 L.Ed.2d at 714. Shenker was clearly an employee of the B&O, “even under the common law loaned-servant doctrine,” and the Court thus refused to allow recovery against the P&LE under the FELA. Ibid. See also Gulf, M. & N. R. Co. Co. v. Graham, 153 Miss. 72, 117 So. 881 (1928) (not involving FELA); 11 Am.Jur. Trials FELA Litigation § 7 (1966); 32 Am.Jur.2d Federal Liability and Compensation Acts § 16 (1967); Annot., 1 A.L.R.2d 302 (1948).
Robertson v. Yazoo & Mississippi Valley Railroad Company, 159 F.2d 31 (5th Cir. 1947), originated from the southern district of Mississippi. The Court of Appeals affirmed a directed verdict for defendant. Plaintiff was a brakeman for the St. Louis-Southwestern Railway Company, known as the Cotton Belt, which had a contract with the defendant railroad allowing the Cotton Belt to use the tracks and facilities of defendant’s yard for a stated charge per car. Plaintiff was passing through defendant’s yard to pick up and take out a train of his general employer, the Cotton Belt, when he was injured by the negligent operation of one of defendant’s locomotives. The Court reviewed the Hull and Linstead cases and in an able opinion by Judge Hutcheson held that plaintiff was not doing the work of defendant at the time of his injury, and that under the limitations of the loaned servant doctrine in Standard Oil Company v. Anderson, plaintiff was not the special employee of the defendant.
Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916 (1946), is a case of dual employment. Haney was a switch tender, employed by the Illinois Central Railroad in the yards of Grand Central Station in St. Louis. His duties included the throwing of switches for the IC, the Frisco, and other railroads using that station. Frisco paid the IC two-twelfths of Haney’s wages for his services. He was killed near the tracks by a blow on the back of his head, caused apparently by a mail hook hanging loosely on the outside of a Frisco train. The Court held that there was sufficient evidence of negligence by both Frisco- and IC to make a jury issue and that both railroads were Haney’s employers.
Of course, no comparable situation exists in the instant case, where the evidence is wholly insufficient to make out a case of dual employment. In further contrast is Byrne v. Pennsylvania Railroad Company, 262 F.2d 906 (3rd Cir. 1958), in which it was held to be a jury issue as to whether an electrical engineer, whose general employer was Westinghouse Corporation, was also an employee of the defendant railroad. Westinghouse manufactured and sold the railroad four locomotives. For the fourteen months before his death, the engineer had been engaged, on a twenty-four hour call basis, in servicing these locomotives after their delivery to the railroad. He had been working exclusively on the railroad’s equipment, supervising and often participating in the repair work himself. He would be notified by a railroad representative of the need for repairs, and the railroad had the right to tell him what to do in respect to the locomotives. Under these circumstances, the Court held that it was a jury *537 issue as to whether the engineer was in dual employment. Nothing similar exists in the present case.
III.
We have examined carefully the cases cited by appellee in support of her position. All of the cases conclude that the particular circumstances of each case must determine the resolution of the issue. They all pertain to the loaned servant or dual employment doctrines. In both aspects, there is insufficient evidence to make even a jury issue in the instant case. Shenker states that “under the common law loaned servant doctrine immediate control and supervision is critical in determining for whom the servants are performing services.” 374 U.S. at 6, 83 S.Ct. at 1671, 10 L.Ed.2d at 714. The evidence here does not indicate any immediate control and supervision by Frisco over the delivery of the string of cars by Union, except for that which necessarily results from the minimum cooperation necessary to carry out a coordinated undertaking, which, as stated in Hull and Shenker, is not enough to transfer Porter from his general employment with Union to a special employment with Frisco.
Moreover, the evidence fails to show any dual or common employment by both railroads, in contrast to the situation in Lavender. Essentially Union, with its own crews, provided switching services for private industries and railroads around the City of Memphis. It was in the nature of an independent contractor in performing these activities. See Annot., 30 A.L.R.2d 517 (1953).
Reversed and judgment rendered here for appellant.
RODGERS, JONES, BRADY and PATTERSON, JJ., concur.