SMITH, Justice.
Robert R. Rodicker, as plaintiff, began the action out of which this appeal arose in the Circuit Court of Scott County against Illinois Central Railroad Company under the provisions of the Federal Employers’ Liability Act. In his declaration Rodicker alleged that he was entitled to recover damages for personal injuries sustained in the course of his employment by the railroad company and because of its negligence.
At the conclusion of all of the evidence, the trial court, on motion, peremptorily directed the jury to find for the defendant upon the ground that Rodicker was not the servant or under the supervision, direction or control of Illinois Central Railroad Company but, at the time of his injury, was the servant and under the supervision, direction and control of New Orleans Union Passenger Terminal and in the performance of his duties for the latter.
On appeal, Rodicker challenges the correctness of the trial court’s action in refusing to submit the case to the jury and in entering judgment for appellee because, (1) the jury should have been instructed that he was a servant of Illinois Central at the time of his injury or (2) there was a factual issue as to that proposition or (3) New Orleans Union Passenger Terminal was an agent of Illinois Central at the time and liability thus was imposed under the Federal Employers’ Liability Act.
New Orleans Union Passenger Terminal (for the sake of brevity referred to as UPT), is a railroad, created and operating under an amendment to the Constitution of the State of Louisiana, Article 14, Section 31.3, Act 385 (1938). It is owned and operated by the City of New Orleans. UPT operates in interstate commerce, is subject to the rules of the Interstate Commerce Commission, may sue and be sued, and is governed by a board of directors. It owns tracks and railroad equipment, and has about 275 employees. Its function, for the City of New Orleans, is to operate a passenger terminal and it contracts with the six railroads operating passenger trains serving that city, namely, Kansas City Southern, Texas & Pacific, Southern, Southern Pacific, Louisville & Nashville, and Illinois Central, to receive service and “break up and make up” passenger trains arriving at or departing from the City of New Orleans.
Under an agreement with the Brotherhood of Railroad Trainmen, yardmen for the switching or operating crews of UPT’s switch engines come from rosters of all of these six railroads. Each of the six is allocated a certain number of UPT jobs under a formula or quota. These jobs are applied for, “claimed,” or “bid” for by the employees of the several roads on the basis of their seniority with their respective “home roads.”
The work of the terminal is done by these yardmen, such as Rodicker, each of whom obtains his job with UPT in this manner. These men work in the UPT yard under the exclusive supervision, direction and control of UPT, acting through its yardmaster. None of the six railroads exercised, attempted to exercise, *416 or retained any right of supervision or control of these employees in the performance of their work for UPT. Under the plan, a three man switching crew might consist of men who had come from the same or from different “home roads” and its actual composition, at any particular time, in this respect, was coincidental.
The Illinois Central was Rodicker’s “home road.” He had bid, claimed or applied for, and had obtained the particular job with UPT on which he was injured, under the seniority rule. On the night of his accident, he had begun work at about 11:55 P.M. At that time, he reported for duty at the switching shanty in the UPT yard. He was the “helper” on UPT Job Number 5. As it happened, the other members of the crew were an engineer and an engine foreman whose home road also was the Illinois Central and who had obtained their jobs with UPT on the basis of seniority with their home road. It was the job of this crew to operate UPT’s Switch Engine Number 3. The UPT yardmaster, who issued orders and was in control of operations, was an employee who had worked for UPT since its inception. Between 11:55 P.M. when Rodicker began his tour of duty and 2:30 A.M. when the accident occurred, the crew of which Rodicker was a member, operating UPT Engine Number 3, had switched trains of several roads, including L & N and Southern Pacific. According to Ro-dicker, the accident occurred in the following manner. UPT’s Switch Engine Number 3 was backing out after having finished coupling an Illinois Central car to a train, and Rodicker was “on board the trailing end of the engine for the purpose of climbing the steps to the platform for a place of safety while riding out of said track, but in the process of climbing the steps and before he could reach the platform an enormous amount of sparks were being emitted from the smoke stack on the diesel engine. They began to burn his neck and his hands so that he was moving away from the sparks and in doing so and while leaning out from the steps of the engine and holding onto the handrails of the engine, his head and shoulder struck a large steel garbage container which knocked appellant from the engine onto the rail of the tracks, rendering him unconscious, and in which accident he sustained serious and permanent injuries, and from which injuries he had been rendered permanently and totally disabled. The negligence charged against the railroad in appellant’s suit was the suffering, allowing and permitting the use of an engine which emitted excessive sparks from its smoke stack and the suffering, allowing and permitting of large steel garbage containers to be left so close to the railroad track that a switchman riding on a car or engine along the track could not clear the garbage container and would come in contact therewith; and switchmen had complained to the railroad about the dangerous practice of leaving the garbage disposal units too close to the track. The dangerous practice of which the railroad company had notice, or by the exercise of reasonable care should have had notice, that existed in regard to the garbage containers being left too close to the track, had existed for a period of fourteen years.”
In support of Rodicker’s contention that, at the time of his injury, he was a servant of Illinois Central, he cites the practice of the six railroads and UPT, in cases where UPT’s employment of a man was for a period of less than 30 days only, of permitting him to dráw pay for the UPT work from his home road. Under this practice in such cases, the home road advanced to the employee the amount due for his UPT work, then billed UPT for it and was reimbursed by UPT. Obviously, this is a payroll procedure for the convenience of all concerned and was designed to simplify bookkeeping and to obviate the need for transferring on the books the names of employees where the period of employment by UPT was of brief duration. In no way does it alter the basic fact that, in the last analysis, the man’s *417 pay for his work at UPT comes from UPT and not from Illinois Central.
Rodicker cites Baker v. Texas & Pacific Railway Company, 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959) in support of the proposition that the trial court should have allowed the case to go to the jury upon the question as to whether he was or was not the servant, and Illinois Central the master, upon the occasion of his injury. In Baker, an employee of Nichols Company had been engaged to do work along the main line of the Texas & Pacific on the right-of-way. The trial court held, as a matter of law, that Baker was not an employee of the railroad at the time of his death. On certiorari, the United States Supreme Court found that there was evidence tending to show that Baker was working on a “task of the railroad,” under the direct supervision and control of a supervisor employed by the railroad, and, there having been countervailing evidence as to this, the question should have been submitted to a jury.
In Baker the United States Supreme Court said:
Here the petitioners introduced evidence tending to prove that the grouting work was part of the maintenance task of the railroad; that the road furnished the materials to be pumped into the roadbed; and that a supervisor, admittedly in the employ of the railroad, in the daily course of the work exercised directive control over the details of the job performed by the individual workmen, including the precise point where the mixture should be pumped, when they should move to the next point, and the consistency of the mixture. (Emphasis added).
Rodicker also cites Terminal Railroad Association of St. Louis v. Fitzjohn, 165 F.2d 473, 1 A.L.R.2d 290 (8th Cir. 1948). In that case Terminal Railroad Association was serving its customer, an ordnance plant operated by the United States Government. The court, on the evidence, held that Fitzjohn had remained an employee of the railroad and had not become a loaned servant of the United States.
In Fitzjohn, the work being done was in furtherance of service being rendered by the single railroad to its customer and, the customer did no more in a supervisory way than is usual in such a relationship in directing what cars should be moved and the operation remained one of the railroad in charge of one of its regular crews. The railroad was reimbursed by the customer for the expense of the crew’s salary in lieu of a fee which the railroad had previously required. As the court observed under the arrangement in Fitzjohn it “contemplated no change in the employment status of the plaintiff or of other members of the switching crew and no deprivation of any of their rights or benefits as employees of the defendant. * * ”
St. Louis-San Francisco Railroad Company v. Porter, 211 So.2d 530 (Miss.1968), was a case which involved a suit by Porter’s administratrix against the railroad under the Federal Employers’ Liability Act. It was alleged that Porter had been an employee of the railroad company at the time of his fatal injury. There was a verdict for the plaintiff. This Court reversed upon the ground that Porter had not been an employee of the defendant railroad when he had been fatally injured. Porter was a switchman employed by another railroad, the Union Railroad Company, in Memphis, Tennessee. Union Railroad Company was Porter’s general employer. The Court said: “On the night of the accident, a Union switching crew, of which Porter was a member, was directed by the Union yardmaster to transfer a string of thirty-nine cars assembled in the Union yard to the Frisco yard.” The crew constituted regular Union Railroad Company employees. The cars were taken to Frisco yard pursuant to these directions and somehow, Porter was killed. The trial court peremptorily directed the jury that Poicer was an employee of Frisco at the time of his death. On appeal, *418 Porter’s administratrix contended that at the time of his death Porter had been a “loaned servant” to the Frisco. This Court rejected that contention and stated “it is clear that Union retained control of its own train crew * * The opinion in Porter contains an extended discussion of the issue. It is clear from the opinion, and from the many authorities there cited, that it is the well established rule that the determination of the question as to who is the master of a servant depends in large measure upon the facts showing under whose supervision and control the injured servant is working at the time of injury.
The United States Supreme Court spelled out the “loaned servant” doctrine in Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909). The case was not brought under the Federal Employers’ Liability Act, but the rule there laid down has been adverted to and followed in a number of subsequent decisions which did involve the Federal Employers’ Liability Act:
In Robertson v. Yazoo & M. V. R. Co., 159 F.2d 31 (5th Cir. 1947) the Court of Appeals for the Fifth Circuit referred to the Standard Oil case, supra, and said:
The opinion in Standard’s case, one of those cases in which the opinion, because of the clear, comprehensive and authoritative way in which it sets out the controlling principles is not just another opinion but a landmark for federal and state courts in the field of law with which it deals, general and special servantship, puts the matter in a nutshell :
“ * * * One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation.
“ * * * The master’s responsibility cannot be extended beyond the limits of the master’s work. If the servant is doing his own work or that of some other, the master is not answerable for his negligence in the performance of it.”
In Porter, supra, this Court cited and discussed Hull v. Philadelphia & Reading Railway Company, 252 U.S. 475, 40 S.Ct. 358, 64 L.Ed 670 (1920) and Linstead v. Chesapeake & Ohio Railway Company, 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453 (1928).
Both of these cases involved the “loaned servant” rule. In the Porter case this Court said of the decision in Hull, supra.
These rules were applied in Hull v. Philadelphia & Reading Railway Company, 252 U.S. 475, 40 S.Ct. 358, 64 L.Ed. 670 (1920). Hull was in the general employ of Western Maryland Company in Pennsylvania, which connected with the Philadelphia and Reading Railway and ran into another city. Through freight trains were operated from the WM to the P&R. Hull was a brakeman on a WM train which was to run over the tracks of the P&R. Before starting, the WM crew received instructions from the P&R yardmaster as to operation of the train, including directions to pick up seven cars at a certain town. While the WM crew was getting these cars on the P&R track, Hull was killed. * * * Affirming a directed verdict for the P&R, the Court said:
[I]n the Employers’ Liability Act Congress used the words “employe” and “employed” in their natural sense, and intended to describe the conventional relation of employer and employe. The simple question is whether, under the facts as recited and according to the general principles applicable to the relation, Hull had been transferred from the employ of the Western Maryland Railway Company to that of defendant for the purposes of the train movement in which he was engaged when killed.
*419 * * * It is clear that each company retained control of its own train crews; that what the latter did upon the line of the other road was done as a part of their duty to the general employer.
******
Linstead v. Chesapeake & Ohio Railway Company, 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453 (1928), * * * [the Court] affirmed a jury finding that the injured plaintiff was a loaned employee of the Chesapeake & Ohio Railway Company. Linstead’s general employer was the Big Four Railroad. There was a thirteen-mile stretch of C&O track below Cincinnati into Kentucky, as to which the two railroads made an arrangement for Big Four to lend to the C&O a locomotive, caboose and train crew to transfer freight trains to the Big Four over the rails of the C&O. * * * When traveling over this thirteen-mile stretch, the Big Four train crew was furnished with time tables and rule books of the C&O and was under the actual supervision and control of its trainmaster. The Big Four locomotive was pulling a train of cars over this stretch of the C&O when it was run into by a C&O train, causing Lin-stead’s death.
* * * [In distinguishing the case from Hull, supra.,] the Court said, * * that Linstead and his crew were doing the work of the C&O, transporting the cars over the thirteen-mile stretch, under the rules of the C&O and the immediate supervision and direction of its train-master in charge of trains of this stretch of the C&O track. For this period there was a transfer of the relation of Lin-stead from the general employment of Big Four to a special employment by C&O. In contrast, [at the time of his injury], Hull was doing the work of the WM and for its benefit. The mere transfer of the WM train to the rails of * * * [P&R] did not * * * [have the effect of making him a servant of P&R].
In Linstead, supra, the Court said:
* * * To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. * * *
* * * It was work for which the Chesapeake & Ohio road was paid according to the tariff approved by the Interstate Commerce Commission; it was work done under the rules adopted by the Chesapeake & Ohio Railway Company; and it was done under the immediate supervision and direction of the trainmaster in charge of the trains running from Stevens to Cincinnati, and that trainmaster was a superior employee of the Chesapeake & Ohio road. We do not think that the fact that the Big Four road paid the wages of Lin-stead and his crew, or that they could only be discharged or suspended by the Big Four, prevented their being the servants of the Chesapeake & Ohio Company for the performance of this particular job.
In distinguishing the Hull and Linstead cases, the Court of Appeals for the Fifth Circuit in Robertson, supra, said:
* * * [T]he evidence was searched out to discover whose work the servant was doing, and the rule was applied accordingly. In Hull's case, it was found that the plaintiff was doing the work of his general employer, in Linstead’s case, that he was not, but, on the contrary, was doing the work of another by whom he had, as to the work he was doing, been specially employed.
* * * * * *
Other cases dealing with this subject are cited in the briefs. In none of them has the Court departed from the well established rule that the answer to *420 the question as to who was the master of the injured servant at the time of his injury depended upon the facts in each case with respect to who had the supervision, direction and control of the details of the work being done by the servant at the time. Here it is undisputed that Rodicker had elected to take the job with UPT, that the work he was doing was being done for UPT, in the UPT yard, with UPT equipment and under the exclusive supervision, direction and control of UPT. There is nothing in the record to indicate that Illinois Central exercised, or attempted to exercise any supervision or control of this work, or retained any right to supervise, direct or control it. The fact that Rodicker’s regular employment (upon which he was not engaged at the time), was with Illinois Central or that his seniority and vacations were determined by his “home road” does not alter these controlling facts. The position of Illinois Central respecting the work being done by Rodicker at the time of his injury was the same as that of the other five railroads whose passenger trains were serviced by UPT.
Upon the undisputed evidence in the record reasonable men could not differ in concluding that, at the time of his injury, Rodicker was the servant of UPT, doing its work, and under its exclusive supervision, direction and control. The trial court correctly found that there was no factual issue as to this and no evidence capable of supporting a jury finding that, at the time of his injury, Rodicker was working as a servant of Illinois Central or under its supervision, direction or control, and his action in directing a verdict for appel-lee was correct.
Affirmed.
GILLESPIE, P. J., and RODGERS, JONES and BRADY, JJ., concur.