[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
On July 22, 1997, the plaintiffs, Dawn Rice and David Rice (the Rices), filed a nine-count complaint against the defendants, Ahmad Fotovat (Fotovat), Passeri, Fotovat and Associates, P.C. (the practice), and St. Vincent's Medical Center (St. Vincent's). This action arises out of injuries and losses allegedly sustained by Dawn Rice while undergoing gall bladder surgery at the hands of Fotovat, her attending surgeon, and Francis Baccay, a surgical resident at St. Vincent's. Counts one (negligence), two (lack of informed consent), and three (loss of consortium) are brought against Fotovat; counts four (negligence), five (lack of informed consent) and six (loss of consortium) are brought against the practice; and counts seven (negligence), eight (lack of informed consent) and nine (loss of consortium) are brought against St. Vincent's.
The defendant St. Vincent's Hospital has moved the court to enter a summary judgment in its favor as to counts seven, eight and nine of the plaintiffs' complaint on the ground that there are no genuine issues of material fact and it is entitled to judgment as a matter of law because Baccay was the "borrowed servant" of Fotovat during Dawn Rice's gall bladder operation.
St. Vincent's argues that it is undisputed that Baccay was assisting Fotovat during the procedure in question and therefore any liability for Baccay's alleged negligence is the sole responsibility of Fotovat under the borrowed servant doctrine. St. Vincent's further argues that it had no duty to obtain Dawn Rice's informed consent before her operation. In support of its motion, St. Vincent's submits the certified deposition testimony of Fotovat.
Fotovat filed a memorandum of law in opposition to St. Vincent's motion for summary judgment on September 16, 2002, claiming that there are genuine issues of material fact concerning dual agency and the benefit CT Page 1569 test of agency law, and that allowing St. Vincent's to escape liability in this case would violate sound public policy. In support of his opposition, Fotovat submits (1) the certified deposition testimony of Vincent Donnelly, a general surgeon at St. Vincent's; (2) a copy of the agreement between St. Vincent's and Westchester County Medical Center that established the residency program at St. Vincent's; (3) a portion of the certified deposition testimony of Fotovat; and (4) the uncertified[1]
deposition testimony of Baccay.
"Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) LaFlamme v. Dallessio, 261 Conn. 247, 250,802 A.2d 63 (2002). "The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Internal quotation marks omitted.) Mytych v. May Dept.Stores Co., 260 Conn. 152, 164 n. 8, 793 A.2d 1068 (2002). "[S]ummary judgment is not well suited to the disposal of complex cases"; Miller v.United Technologies Corp., 233 Conn. 732, 752, 660 A.2d 810 (1995); and is "apt to be ill adapted to cases . . . involving important public issues, which often need the full exploration of trial." United Oil Co.v. Urban Redevelopment Commission, 158 Conn. 364, 375, 260 A.2d 596
(1969). In particular, "[i]ssues of negligence are ordinarily not susceptible of summary adjudication but should be resolved by trial in the ordinary manner." (Internal quotation marks omitted.) Fogarty v.Rashaw, 193 Conn. 442, 446, 476 A.2d 582 (1984).
St. Vincent's moves for summary judgment on the grounds that there are no genuine issues of material fact and it is entitled to judgment as a matter of law because (1) Baccay was the "borrowed servant" of Fotovat and (2) it had no duty to obtain Dawn Rice's informed consent before surgery was performed by a non-employee doctor.
In support of the motion, St. Vincent's submits the deposition testimony of Fotovat. Fotovat testified that Dawn Rice had been referred to the practice concerning a polyp in her gall bladder. (St. Vincent's Memorandum of Law in Support of its Motion for Summary Judgment, Exhibit A, pp. 16, 18.) On August 14, 1996, Fotovat scheduled Dawn Rice for a laparoscopic cholecystectomy (gall bladder removal), to be performed on CT Page 1570 September 4, 1996 at St. Vincent's. (St. Vincent's Memorandum, Exhibit A, p. 25.) Fotovat explained that a laparoscopic cholecystectomy involves inserting "a needle in the abdomen called a Verese . . . to insufflate the abdomen with CO2 gas, and then [inserting] a larger port in to place a camera inside, then three more ports . . . to perform the procedure." (St. Vincent's Memorandum, Exhibit A, p. 28.) The "port" inserted into each incision made by the Verese needle, and through which the camera is inserted, is called a "trocar." (St. Vincent's Memorandum, Exhibit A, p. 30.)
Fotovat further testified that during Dawn Rice's laparoscopic cholecystectomy, Baccay made the first incision and inserted the first trocar under Fotovat's guidance. (St. Vincent's Memoradum, Exhibit A, p. 33.) Fotovat first pointed to the proper location of the incision and and then instructed Baccay as to the proper angle at which to place the trocar. (St. Vincent's Memorandum, Exhibit A, pp. 43-44.) Fotovat watched Baccay throughout the insertion of the first trocar. (St. Vincent's Memorandum, Exhibit A, p. 81.) Fotovat testified that in placing the first trocar, Baccay appeared to be following his instructions. (St. Vincent's Memorandum, Exhibit A, p. 79.) During the placing of the first trocar, however, Dawn Rice's vena cava, iliac artery, and small bowel were lacerated, presumably as a result of the trocar being inserted at an improper angle. (St. Vincent's Memorandum, Exhibit A, p. 48.) Fotovat believed that during the insertion of the trocar Baccay's hand had slipped, resulting in a change of angle. (St. Vincent's Memorandum, Exhibit A, p. 53.)
Fotovat also testified that he was the surgeon "in charge" of Dawn Rice's surgery. (St. Vincent's Memorandum, Exhibit A, p. 74.) He also stated that Baccay was a third-year surgical resident from New York Medical College, and that while it was routine at St. Vincent's to have a surgical resident assist an attending surgeon, he could have utilized another physician as his assistant if he had so desired. (St. Vincent's Memorandum, Exhibit A, p. 76.)
In opposition to St. Vincent's motion for summary judgment, Fotovat argues that genuine issues of material fact exist as to whether Baccay was simultaneously serving two masters and whether Baccay's services benefited only Fotovat. Fotovat also claims that holding an attending physician at a teaching hospital automatically liable for the negligence of a resident and allowing the hospital to escape liability would violate sound public policy. In support of his opposition, Fotovat submits the deposition testimony of Donnelly, a general surgeon at St. Vincent's who has been "involved" with the residency program established between St. Vincent's and New York Medical College. (Fotovat's Memorandum in CT Page 1571 Opposition to St. Vincent's Motion for Summary Judgment, Deposition of Vincent Donnelly, June 10, 2002 (Donnelly Deposition), p. 4.) Fotovat also submits copies of the original contract between Westchester County Medical Center and St. Vincent's that established the residency program at St. Vincent's.
Donnelly testified that during Dawn Rice's laparoscopy, Fotovat was the "captain of the ship." (Donnelly Deposition, p. 10.) He also stated, however, that St. Vincent's is responsible for paying the salary of its residents. (Donnelly Deposition, p. 22.) St. Vincent's also assumes the cost of malpractice insurance for each resident. (Donnelly Deposition, p. 9.) In return, St. Vincent's receives the services of the residents for far less than it would cost the hospital to hire physician's assistants to aid the surgeons in the operating rooms. (Donnelly Deposition, p. 23.) As a teaching hospital, St. Vincent's also collects a higher amount for each Medicare patient through what is called the "Medicare Pass-Thru" program. (Donnelly Deposition, p. 18.) Donnelly further testified that "[t]he residents add a great deal of value to the hospital" in that "[t]hey make everybody read. They keep [the hospital] up-to-date. They question things at conference. They bring new techniques to [the hospital] from New York Medical College and vice-versa." (Donnelly Deposition, p. 18.) Attending physicians may utilize the services of residents as part of their "privileges" at St. Vincent's, but are not compensated by St. Vincent's for any instruction they may give the residents. (Donnelly Deposition, p. 10.)
Donnelly also testified that the assignment of residents to particular operations is handled by the chief resident, usually on the night before or the morning of surgery. (Donnelly Deposition, p. 28.) A private attending surgeon, however, is free to request a particular resident to assist, and has the right to refuse any resident that may be assigned to him. (Donnelly Deposition, pp. 29-30.) In addition, an attending surgeon such as Fotovat could, if he chose, hire other private surgeons to assist him. (Donnelly Deposition, p. 44.) The cost of hiring other private surgeons would be borne by the patient, and not by the hiring physician. (Donnelly Deposition, p. 44.)
AS TO COUNT SEVEN (NEGLIGENCE)
"[T]he borrowed servant rule . . . provides that the person to whom the services of another's employee are loaned is responsible for the employee's negligence so long as the temporary master actually exercises supervision and control over the servant." Mather v. Griffin Hospital,207 Conn. 125, 136, 540 A.2d 666 (1988). The rule finds its roots in the common law and was recognized by the United States Supreme Court as early CT Page 1572 as 1909. Standard Oil Co. v. Anderson, 212 U.S. 215, 221-22,29 S.Ct. 252,53 L.Ed. 480 (1909). "The master's responsibility cannot be extended beyond the limits of the master's work. If the servant is doing his own work or that of some other, the master is not answerable for his negligence in the performance of it." (Internal quotation marks omitted.)Linstead v. Chesapeake Ohio R., 276 U.S. 28, 33, 48 S.Ct. 241,72 L.Ed. 453 (1928).
"It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him the men to do the work and places them under his exclusive control in the performance of it, those men became pro hac vice the servants of him to whom they are furnished." (Emphasis in original; internal quotation marks omitted.)Parsons v. Daly Sons, 114 Conn. 143, 149, 158 A. 216 (1932).
"But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still in its doing his own work." (Internal quotation marks omitted.) Linstead v. Chesapeake Ohio R., supra, 278 U.S. 33-34; accord Bria v. St. Joseph's Hospital, 153 Conn. 626, 630, 220 A.2d 29
(1966). In determining whether a servant is "borrowed" for purposes of the borrowed servant doctrine, "[t]he general test is whether the act is done in business of which the [master] is in control as a proprietor, so that he can at any time stop it or continue it, and determine the way in which it shall be done, not merely in reference to the result to be reached, but in reference to the method of reaching the result . . . The test is whether, in the particular service which he is engaged to perform, [the servant] continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired." (Citation omitted; emphasis added; internal quotation marks omitted.) Parsons v. Daly Sons, supra, 114 Conn. 149.
In the present case, the court finds that there is a genuine issue of material fact as to whether Baccay "continued liable to the direction and control" of St. Vincent's during Dawn Rice's gall bladder surgery. Id.
While both Fotovat and Donnelly testified that Fotovat was solely CT Page 1573 responsible for guiding and supervising Baccay during the procedure, Donnelly also testified that it was the chief resident, and not Fotovat, who had assigned Baccay to Dawn Rice's case, and that it was St. Vincent's, and not Fotovat, that was responsible for compensating Baccay for his assistance in Dawn Rice's surgery. Donnelly also testified that the services of surgical residents are of great financial benefit to St. Vincent's, and that St. Vincent's gleans intangible benefits from its residents as well. The court further finds that a question of fact exists as to whether, during Dawn Rice's surgery, Baccay was engaged in the "business" of Fotovat or of St. Vincent's. See Tierney v. Correia,120 Conn. 140, 144-46, 180 A. 282 (1935) (court may consider the "payment of wages; the right to hire or discharge; the right to direct the servant where to go, what to do; the custody or ownership of the tools and appliances he may use in his work" in determining "[i]n whose business was the servant engaged at the time"). Viewing the evidence in the light most favorable to Fotovat, the nonmoving party, the court finds that significant issues of material fact remain as to whether Baccay was truly Fotovat's borrowed servant.
St. Vincent's relies on Alswanger v. Smego, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. X05 CV 920125294 (April 21, 1999, Tierney, J.) (24 Conn.L.Rptr. 471), aff'd. on other grounds, 257 Conn. 58, 776 A.2d 444 (2001), to support its contention that Baccay was the borrowed servant of Fotovat. In Alswanger v. Smego, the plaintiff underwent surgery at a hospital at the hands of his attending surgeon and a surgical resident, and was injured due to the negligence of the resident. Id. The plaintiff sued the attending surgeon and the hospital. Id. The hospital moved for summary judgment on the ground that the attending surgeon bore exclusive liability for the resident's negligence because the resident was the attending surgeon's borrowed servant. Id. Although the court denied the motion for summary judgment, it later granted the hospital's motion for directed verdict based on its finding that the resident was indeed the borrowed servant of the attending surgeon. Id.
Although the underlying facts outlined above are strikingly similar to those in the present case, St. Vincent's reliance on Alswanger v. Smego
is misplaced. While it is true that the court in Alswanger v. Smego
ultimately found that the resident was the borrowed servant of the attending surgeon, it did so only after the full exploration of trial. Moreover, the Alswanger v. Smego court had initially refused to grant summary judgment on the same ground. As previously noted, "summary judgment is not well suited to the disposal of complex cases"; Miller v.United Technologies Corp., supra, 233 Conn. 752; and is "apt to be ill adapted to cases . . . involving important public issues, which often CT Page 1574 need the full exploration of trial." United Oil Co. v. UrbanRedevelopment Commission, supra, 158 Conn. 375. The question of whether Baccay was the borrowed servant of Fotovat presents complex factual inquiries that are ill-suited to summary judgment, and the "important public issue" of who bears liability for a resident's negligence should be determined only after "the full exploration of trial." The motion for summary judgment is denied as to Dawn Rice's negligence claim because St. Vincent's has failed to meet its burden of showing the absence of genuine issues of material facts.
AS TO COUNT EIGHT (LACK OF INFORMED CONSENT)
A "defendant hospital [has] no duty to obtain the plaintiff's informed consent for surgery to be performed by a nonemployee physician . . ."Petriello v. Kalman, 215 Conn. 377, 385, 576 A.2d 474 (1990). In the present case, St. Vincent's claims that it is entitled to judgment as a matter of law because it is undisputed that Fotovat is not its employee. As previously discussed, however, there is a genuine issue of material fact as to whether Baccay was employed by St. Vincent's or Fotovat for the purposes of Dawn Rice's gall bladder surgery. Because a genuine issue of material fact exists as to whether St. Vincent's had a duty to obtain Dawn Rice's informed consent based on Baccay's status during her surgery, St. Vincent's motion for summary judgment is also denied as to Dawn Rice's claim of lack of informed consent.
AS TO COUNT NINE (LOSS OF CONSORTIUM)
Additionally, the motion is also denied as to David Rice's claim for loss of consortium because that claim is "derivative and inextricably attached to the claim[s] of the injured spouse," Dawn Rice. (Internal quotation marks omitted.) QSP, Inc. v. Aetna Casualty Surety Co.,256 Conn. 343, 380, 773 A.2d 906 (2001).
For the foregoing reasons, St. Vincent's motion for summary judgment on counts seven, eight and nine is hereby denied.
By the Court,
Joseph W. Doherty, Judge